No. 12-35287

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIVE VILLAGE OF POINT HOPE, INUPIAT COMMUNITY OF THE
ARCTIC SLOPE, ALASKA WILDERNESS LEAGUE, CENTER FOR
BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, NATIONAL
AUDUBON SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL,
NORTHERN ALASKA ENVIRONMENTAL CENTER, OCEANA, PACIFIC
ENVIRONMENT, RESISTING DESTRUCTION ON INDIGENOUS LANDS
(REDOIL), SIERRA CLUB, THE WILDERNESS SOCIETY, and
WORLD WILDLIFE FUND,

*Plaintiffs-Appellants*,

v.

KENNETH L. SALAZAR, Secretary of the Interior; TOMMY BEAUDREAU,
Director of Bureau of Ocean Energy Management; and
BUREAU OF OCEAN ENERGY MANAGEMENT,

*Defendants-Appellees,*

SHELL GULF OF MEXICO INC., CONOCOPHILLIPS COMPANY, STATE OF
ALASKA, and STATOIL USA E&P, INC.,

*Intervenor Defendants-Appellees*

On Appeal from the United States District Court for the District of Alaska
_____

APPELLANTS' OPENING BRIEF
_____

Erik Grafe
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907-792-7102

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907-586-2751

Date: July 23, 2012

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Native Village of Point Hope, Inupiat Community of the Arctic Slope, Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, National Audubon Society, Natural Resources Defense Council, Northern Alaska Environmental Center, Oceana, Pacific Environment, Resisting Destruction on Indigenous Lands (REDOIL), Sierra Club, The Wilderness Society, and World Wildlife Fund hereby state that none of them has any parent companies, subsidiaries, or affiliates that have issued shares to the public.

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................4

STATEMENT OF ISSUES ............................................................................4

STATEMENT OF THE CASE........................................................................5

STATEMENT OF FACTS ..............................................................................6

I. THE CHUKCHI SEA...............................................................................6

II. THE CHUKCHI SEA LEASE SALE .......................................................8

III. BOEM'S TREATMENT OF MISSING INFORMATION IN THE
NEPA ANALYSES FOR THE LEASE SALE................................................9

    A.    The EIS for the lease sale.................................................................9

        1.    The EIS disclosed vast information gaps...................................9

        2.    The EIS acknowledged that missing information
            constrained BOEM's analysis of the lease sale's impacts........10

        3.    Missing information constrained BOEM's comparison
            and development of lease sale alternatives ..............................13

            a.    Comparison of lease sale alternatives...........................14

            b.    Formulation of lease sale alternatives ...........................15

    B.    BOEM's initial failure to address missing information ......................17

    C.    BOEM's approach to missing information on remand .......................17

        1.    BOEM's response to agency comments questioning its
            "not essential" conclusions ......................................................19

        2.    BOEM's response to a parallel United States Geological
            Survey assessment of Arctic missing information...................20

ii

3.   The Secretary adopted BOEM's conclusions. ...........................22

IV.   THE ASSUMPTIONS UNDERLYING BOEM'S ANALYSIS OF IMPACTS OF THE LEASE SALE ...........................................22

V.   APPELLANTS' INTERESTS...................................................28

SUMMARY OF ARGUMENT ...........................................................28

ARGUMENT .........................................................................30

I.   STANDARD OF REVIEW.........................................................30

II.   BOEM'S CONCLUSION THAT NONE OF THE MISSING CHUKCHI SEA INFORMATION IS ESSENTIAL TO A REASONED CHOICE AMONG ALTERNATIVES FOR THE LEASE SALE IS ARBITRARY .................................................31

   A.   Section 1502.22 furthers NEPA's basic requirement that an EIS contain an informed comparison of alternatives and alternatives that avoid or minimize adverse effects.....................................33

   B.   Missing information about the Chukchi Sea constrained BOEM's comparison and development of lease sale alternatives, and therefore the agency's conclusion that none of the missing information is essential to the choice among alternatives is arbitrary ...................................................36

      1.   At the lease sale stage of offshore development, information is essential if it is needed to assess differences in the effects of oil and gas development in different areas under consideration for leasing.......................36

      2.   The EIS for the lease sale acknowledged that missing information precluded full assessment of the effects of oil and gas activities and the absence of that information seriously limited BOEM's alternatives analysis.......................38

   C.   BOEM's five boiler-plate explanations in the SEIS appendix fail to justify BOEM's "not essential" conclusion.............................40

iii

III.   THE EIS FAILED TO ANALYZE THE FULL IMPACTS OF THE
       LEASE SALE BECAUSE IT ARBITRARILY BASED ITS
       ANALYSIS ON ACTIVITIES ASSOCIATED WITH ONLY THE
       MINIMUM AMOUNT OF OIL POSSIBLE FOR DEVELOPMENT.........48

       A.   BOEM based the scenario on an arbitrary assumption .......................48

       B.   The arbitrary assumption underlying the scenario caused
            BOEM to misleadingly understate the effects of the lease sale
            in violation of NEPA..........................................................................51

IV.    BECAUSE THE LEASE SALE WAS AFFIRMED IN VIOLATION
       OF NEPA AND THE APA, THE COURT SHOULD VACATE THE
       SALE AND ISSUANCE OF LEASES .......................................................55

CONCLUSION ...................................................................................................59

# TABLE OF AUTHORITIES

## CASES

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001)................................................................56

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)......................................................................58, 59

*Andrus v. Sierra Club*,
442 U.S. 347 (1979)..........................................................................33

*Cal. Wilderness Coal. v. U.S. Dept. of Energy*,
631 F.3d 1072 (9th Cir. 2011) .............................................................55

*City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*,
123 F.3d 1142 (9th Cir. 1997) .............................................................35

*City of Davis v. Coleman*,
521 F.2d 661 (9th Cir. 1975) ...............................................................54

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) .............................................................51

*Ctr. for Biological Diversity v. U.S. Dept. of Interior*,
563 F.3d 466 (D.C. Cir. 2009).............................................................36

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009)..........................................................................42

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004) .............................................................31

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ...............................................................56

*Kern v. Bureau of Land Mgmt.*,
284 F.3d 1062 (9th Cir. 2002) .............................................................54

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) ..........................................................31, 55

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008), *overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)......................................42, 51

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ...............................................................31

*Mass. v. Watt*,
    716 F.2d 946 (1st Cir. 1983)................................................51, 55, 56

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) ...............................................47, 57

*Mobil Oil & Producing Se., Inc. v. United States*,
    530 U.S. 604 (2000)................................................................37

*Montana Wilderness Ass'n v. McAllister*,
    666 F.3d 549 (9th Cir. 2011) ...............................................................33

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.*
.   *Auto. Ins.Co.*,
    463 U.S. 29 (1983)................................................33, 42, 49, 51

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ...............................................................35

*N. Cheyenne Tribe v. Hodel*,
    851 F.2d 1152 (9th Cir. 1988) ...............................................56, 57, 59

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ...............................................................45

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) ...............................................................35

*Natural Res. Def. Council v. Houston*,
    146 F.3d 1118 (9th Cir. 1998) ...............................................55, 56

*Natural Res. Def. Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ...............................................................47

*Or. Natural Res. Council Fund v. Goodman*,
    505 F.3d 884 (9th Cir. 2007) ...............................................................42

vi

*Pac. Rivers Council v. U.S. Forest Serv.*,
2012 WL 2333558 (9th Cir. June 20, 2012)......................................44, 48, 53, 54

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ........................................................................57

*Res. Ltd., Inc. v. Robertson*,
35 F.3d 1300 (9th Cir. 1994) ........................................................................30

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ........................................................................44

*S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*,
720 F.2d 1475 (9th Cir. 1983) ......................................................................44

*Save Our Ecosystems v. Clark*,
747 F.2d 1240 (9th Cir. 1984) ......................................................................34

*Se. Alaska Conservation Council v. Fed. Highway Admin.*,
649 F.3d 1050 (9th Cir. 2011) .............................................................34, 38, 55

*State of Cal. v. Watt*,
683 F.2d 1253 (9th Cir. 1982), *rev'd on other grounds sub nom. Sec. of
Interior v. Cal.*, 464 U.S. 312 (1984)...........................................................55

*Tribal Vill. of Akutan v. Hodel*,
869 F.2d 1185 (9th Cir. 1988) ......................................................................55

*Union Oil Co. of Cal. v. Morton*,
512 F.2d 743 (9th Cir. 1975) ........................................................................37

*Vill. of False Pass v. Clark*,
733 F.2d 605 (9th Cir. 1984) ..............................................................37, 55, 59

*W. Oil & Gas Ass'n v. EPA*,
633 F.2d 803 (9th Cir. 1980) ........................................................................56

**STATUTES**

5 U.S.C. § 706(2) ............................................................................31, 33, 56

28 U.S.C. § 1291...................................................................................4

28 U.S.C. § 1331 ...................................................................................4

43 U.S.C. § 1332(3) ........................................................................56, 59

43 U.S.C. § 1334 ........................................................................8, 37, 43

43 U.S.C. § 1337 ...................................................................................8

43 U.S.C. § 1340 ..............................................................................8, 43

43 U.S.C. § 1344 ..............................................................................8, 43

43 U.S.C. § 1351 ..............................................................................8, 43

## REGULATIONS

40 C.F.R. § 1500.3 ..............................................................................33

40 C.F.R. § 1502.1 ....................................................................35, 39, 46

40 C.F.R. § 1502.2(g) ..........................................................................57

40 C.F.R. § 1502.14 .............................................................................34

40 C.F.R. § 1502.22 ....................................... 2, 4, 17, 29, 31, 33, 34, 37

## FEDERAL REGISTER NOTICES

Council on Environmental Quality, National Policy Act Regulations,
    Incomplete or Unavailable Information Final Rule
    51 Fed. Reg. 15,618 (Apr. 25, 1986)................................................34

Minerals Management Service, Notice of Intent to Prepare An
    Environmental Impact Statement, Chukchi Sea Oil and Gas Lease Sale
    193 for Year 2007
    70 Fed. Reg. 54,406 (Sept. 14, 2005)...............................................26

Bureau of Ocean Energy Management, Reorganization of Title 30 Direct
    Final Rule
    76 Fed. Reg. 64,432 (Oct. 18, 2011) .................................................2

**RULES**

Fed. R. App. P. 4(a)(1)(B)(ii) ................................................................4

INTRODUCTION

This appeal challenges the Secretary of the Interior's February, 2008, decision, reaffirmed by the Secretary in October, 2011, after a district court remand, to hold an offshore oil and gas lease sale offering approximately 29.4 million acres in the Chukchi Sea, a pristine, undeveloped portion of the Arctic Ocean off the northwest coast of Alaska.

The Chukchi Sea provides habitat and rich feeding grounds for a great variety of marine life, including species protected under the Endangered Species Act (ESA) such as bowhead, humpback, and fin whales, polar bears, and spectacled and Steller's eiders, and irreplaceable subsistence resources upon which Inupiat communities along its coast have depended for thousands of years. Despite the cultural and biological significance of the Chukchi Sea, there is a profound lack of basic information about the sea and the wildlife that inhabits it.

This appeal concerns the agency's failure to account for that missing information and otherwise assess adequately pursuant to the requirements of the National Environmental Policy Act (NEPA) the potentially dramatic impacts of the lease sale on wildlife and vital Alaska Native subsistence traditions. First, the

1

Bureau of Ocean Energy Management (BOEM)[1] failed to address adequately the vast volume of missing data about the basic ecology of the Chukchi Sea and the effects of oil and gas activity in the region. The environmental impact statement (EIS) BOEM prepared for the lease sale forthrightly acknowledged that basic information was missing about the Chukchi Sea and nearly every species that inhabits it, and the absence of this information rendered the agency unable in many instances to assess the effects of oil and gas activities. Initially, the agency failed to inquire, as required by a binding Council on Environmental Quality (CEQ) regulation, 40 C.F.R. § 1502.22 (Section 1502.22), whether any of this missing information was essential to a reasoned choice among lease sale alternatives. The district court determined that BOEM's failure "was arbitrary" in light of the "dozens if not hundreds of entries [in the EIS] indicating a lack of information about species/habitat, as well as a lack of information about effects of various activities on many species," and remanded the decision to the agency. I-ER-23-24, 26-27.

During the remand period, BOEM prepared a supplemental EIS (SEIS) to address the court's order. The SEIS did not amend the analysis or conclusions of

---

[1] BOEM is the successor agency to the Minerals Management Service (MMS) and Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), which prepared the original and supplemental environmental impact statements for the lease sale, respectively. *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011); V-ER-774; Secretarial Order No. 3302 (June 18, 2010); II-ER-129. Appellants refer to the agencies as BOEM throughout this brief.

the EIS or attempt to fill the many gaps it acknowledged. Rather it determined that not a single piece of missing information identified in the EIS was essential to a reasoned choice among alternatives pursuant to Section 1502.22. II-ER-209-308, 308b. This determination is arbitrary because it cannot be squared with the agency's own analysis in the lease sale EIS.

Second, BOEM violated NEPA because, departing from past practice, it based its analysis of the environmental effects of the sale on a forecast of lease sale oil and gas activity that arbitrarily assumed that oil development would occur only at the minimum possible level. The agency thus limited the analysis in the EIS to the effects of industrial activities associated with the discovery, development, and production of one billion barrels of oil even though it projected twelve times that amount could be economic to produce. As a result, BOEM seriously understated the potential industrial activity that could result from the sale and, therefore, the potential impacts of the sale, ranging from significant disturbance of wildlife to the risk of a catastrophic oil spill.

These substantial failures by the agency go to the heart of the decision made by the Secretary in the lease sale—how to strike the balance between protection and development of offshore areas—and therefore this Court should vacate the decision and remand it to the Secretary to reconsider in light of a proper

accounting of missing information and a reasonable projection of potential impacts.

## JURISDICTIONAL STATEMENT

Jurisdiction in the district court was based on 28 U.S.C. § 1331, because the action arises under federal statutes. Jurisdiction in this Court is based on 28 U.S.C. § 1291, because this is an appeal from a final decision. The district court entered a final judgment on February 15, 2012. I-ER-1. Appellants filed the notice of appeal on April 12, 2012, II-ER-49-52, within the 60 days allowed for appeals when an agency of the United States is a party. Fed. R. App. P. 4(a)(1)(B)(ii).

## STATEMENT OF ISSUES

1. Did BOEM act arbitrarily, capriciously, or not in accordance with law by concluding that none of the missing information about the Chukchi Sea ecosystem is "essential to a reasoned choice among alternatives" for an offshore oil and gas lease sale pursuant to 40 C.F.R. § 1502.22, where the agency's EIS for the decision disclosed that the missing information precluded effective comparison of alternatives and design of alternatives that would minimize effects of the action?

2. Did BOEM act arbitrarily, capriciously, or not in accordance with law by limiting its analysis of the environmental effects of an offshore oil and gas lease sale to only those resulting from the minimum level of oil and gas development, in

4

contrast to its own projections for higher levels of development and its own prior practice, and thereby understating the sale's potential impacts?

## STATEMENT OF THE CASE

Appellants filed their original complaint challenging the lease sale decision on January 31, 2008. CR 1. The district court granted motions by Shell Gulf of Mexico Inc., ConocoPhillips Company, the State of Alaska, and Statoil USA E&P Inc. to intervene as defendants. CR 28, 103, 222.

On August 5, 2010, the district court issued an order granting in part and denying in part Appellants' summary judgment motion. I-ER-26. The court remanded the decision to the agency with instruction for BOEM to "satisfy its obligations under NEPA." I-ER-26-27.

During the remand period, BOEM prepared an SEIS to address the court's order. On October 3, 2011, the Secretary issued a decision to affirm the lease sale in its entirety with no changes. III-ER-407-47. Following the remand decision, Appellants filed an amended and supplemental complaint and motion for summary judgment on the grounds that the remand analysis and decision to affirm the lease sale violated NEPA. II-ER-89-99; CR 249. The district court issued an order denying Appellants' motion for summary judgment on February 13, 2012, I-ER-2-6, and entered a final judgment in the case on February 15, 2012, I-ER-1.

Appellants appealed the final judgment and orders underlying it on April 12, 2012. II-ER-49-52.

STATEMENT OF FACTS

I.      THE CHUKCHI SEA

The Chukchi Sea, a portion of the Arctic Ocean off the northwest coast of Alaska, provides habitat and rich feeding grounds for a great variety of marine life and irreplaceable subsistence resources upon which Inupiat communities along its coast have depended for thousands of years.  V-ER-834-49.  Every spring, nearly the entire western Arctic stock of bowhead whales, including mothers and calves, migrates north and east through the Chukchi Sea on its way to summer feeding grounds, and every autumn it returns south and west through the sea to its wintering grounds.  V-ER-808-10.  Almost the entire Chukchi Sea provides vital feeding and denning habitat for polar bears.  V-ER-830.  Pacific walrus, particularly females, calves and sub-adults, use the sea as their primary feeding grounds in summer and autumn.  V-ER-825.  Ringed, spotted, ribbon and bearded seals, beluga whales, killer whales, minke whales, gray whales, and harbor porpoises, as well as at least 98 species of fish, including Pacific salmon and Arctic cod, and over 40 species of marine and coastal birds, also inhabit the sea.  V-ER-807, 815-24.

6

The Chukchi Sea is the center of the culture, identity, and subsistence way of life of Inupiat communities along its coast. V-ER-834-47; III-ER-574-76; III-ER-563-64; IV-ER-598-600, 602-03; III-ER-579-82; IV-ER-586-87; III-ER-568-70; IV-ER-593-95. The sea provides these communities with food, clothing, and materials for traditional arts. For example, the EIS states that over 65 percent of the households of Point Hope obtained half or more of their food from harvesting local subsistence resources in 2003. V-ER-980. Communities along the Chukchi coast, including Barrow and Point Hope, engage in subsistence hunting of bowhead whales each spring and, in Barrow, fall as well. V-ER-837. These communities and others, such as Point Lay and Atquasuk, engage in extensive food sharing and bartering, which is an integral part of traditional Inupiat family organization. V-ER-834. Thus, all across the North Slope, in communities that engage directly in whaling as well as in communities that do not, the bowhead is of unique spiritual importance, a focal point of sharing, cooperation and the preservation of cultural traditions. V-ER-837. Aside from the bowhead whale, Chukchi communities engage in subsistence hunting of walrus, seals, beluga whales, polar bears, birds, and fish, all of which depend upon the health of the Chukchi Sea. V-ER-846-49, 983-991. The importance of these subsistence activities can hardly be overstated—they are at the core of Inupiat identity. V-ER-834.

Despite the cultural and biological significance of the Chukchi Sea, there is a profound lack of basic knowledge about the sea and the wildlife that inhabits it. *See, e.g.,* III-ER-471-510; *infra* at 9-10, 20-22. The lack of baseline data about the sea is compounded by the rapid changes to the ecosystem caused by global climate change that are dramatically affecting many species in the region. V-ER-807a.

## II.    THE CHUKCHI SEA LEASE SALE

The Chukchi Sea lease sale was the second stage in the four-stage process for offshore oil and gas development under Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. (OCSLA). *See generally* 43 U.S.C. §§ 1334, 1337. A lease sale is preceded by a "five-year program," which is a nationwide schedule of proposed offshore lease sales over a five-year period, 43 U.S.C. § 1344, and followed by exploration plans, 43 U.S.C. § 1340, and, if commercial resources are discovered, development plans, 43 U.S.C. § 1351. At the lease sale stage, BOEM analyzes different combinations of geographic areas available for leasing, from which it chooses whether, where, and under what conditions to open chosen areas to oil and gas activities. *See* V-ER-1019-20. Here, BOEM ultimately decided to offer for lease about 29.4 million acres—an area nearly the size of Connecticut and encompassing much of the sea. IV-ER-764; V-ER-991a. In connection with the decision, BOEM prepared an EIS to disclose the potential effects of the sale to the public and decisionmaker. Appellants filed their complaint challenging the

8

decision to hold the sale and the underlying EIS on January 31, 2008. CR 1.

BOEM held the sale on February 6, 2008. III-ER-411.

III. BOEM'S TREATMENT OF MISSING INFORMATION IN THE NEPA ANALYSES FOR THE LEASE SALE

    A.    <u>The EIS for the lease sale</u>

        *1.    The EIS disclosed vast information gaps*

BOEM acknowledged in the EIS it prepared for the lease sale that there is "a paucity of recent data [about the Chukchi Sea] upon which to base informed decisions . . . ." V-ER-911. Reflecting the lack of data, the EIS contained literally hundreds of acknowledgments of missing information for nearly every species that inhabits the Chukchi Sea. The acknowledgments of major data gaps range from fish and birds and marine mammals generally to keystone species such as bowhead whales, beluga whales, and walrus. V-ER-806 (for fish, "[i]nformation of current distribution and abundance . . . estimates, age structure, population trends, or habitat use areas are not available"); V-ER-960 (for marine mammals, "[v]ery little is known about the distributions, population sizes or habitat use"); V-ER-896 (for birds, "[d]espite the importance of [coastal habitat areas], as well as the entire Chukchi Sea within the proposed lease-sale area, little recent site-specific data are available on habitat-use patterns, routes, and timing to assess impacts," and "[f]or many species, the most recent data are between 15 and 30 years old, making accurate analysis difficult"); V-ER-814 (for bowhead whales, "[r]ecent data on

distribution, abundance, or habitat use in the Chukchi Sea Planning Area are not available"); V-ER-884 ("data are . . . not available to determine . . . whether large aggregations [of bowhead whales] exist in certain places due to prey resources"); V-ER-890 ( "the factors associated with the presence of [bowhead whale] aggregations in the Chukchi Sea] are not yet clear"); V-ER-912 (for beluga whales, "[l]ate-summer distribution and fall-migration patterns are poorly known, wintering areas effectively are unknown, and areas that are particularly important for feeding have not been identified"); V-ER-968 (BOEM "is unaware of any delineation of walrus habitat precise enough to allow an evaluation of important walrus feeding areas").

A document prepared by Appellants at the district court excerpting the EIS's many statements acknowledging unknowns runs to nearly forty pages. III-ER-471-510. *See also* I-ER-22-23 (district court decision referring to the document and stating the EIS's acknowledgments of "dozens if not hundreds of entries indicating a lack of information").

  2.  *The EIS acknowledged that missing information constrained BOEM's analysis of the lease sale's impacts*

One of the "principles" underlying the EIS's analysis of the lease sale's potential effects was that "'key habitat types' such as those used for calving, feeding, breeding, and resting . . . merit special consideration," because species, such as whales, "do not use all portions of their range in random fashion." V-ER-

10

878. *See also* V-ER-912 ("Understanding the distribution and timing of movements of belugas is important for planning lease sales in the Chukchi Sea and designing possible mitigation measures."). "Thus, impacts in all portions of the range are not of equal importance." V-ER-878-79. Disturbance in key habitat areas, the EIS recognized, could have greater impacts on the species. For example, the EIS stated for whales that "[i]f noise causes disruption of important behaviors such as mating, nursing, or feeding, or if animals are scared away from important habitat over long periods of time, then these impacts [of noise and disturbance from lease sale activities] could affect the long-term survival of the population." V-ER-905. *See also* V-ER-882 (stating there are "[a]reas and [s]ituations [w]here [p]otential [i]mpacts are [l]ikely to be [g]reater than [t]ypical"); V-ER-890 (stating there are "[e]xtraordinary [c]ircumstances" in which oil spills could have particularly severe effects on bowhead whales); V-ER-911 (stating oil spills could have greater effects if they contact whale aggregations). Similarly, "[i]f disturbance causes walruses to abandon preferred feeding areas or interferes with calf-rearing, resting, or other activities, then the walrus population could be negatively affected." V-ER-904. *See also* V-ER-898 ("[t]he potential for a given sound to cause adverse effects to Pacific walruses is expected to be habitat dependent"); V-ER-907-08 (stating oil spills could have greater effects if they contact walrus aggregations).

11

However, the EIS acknowledged that data are missing about what areas of the Chukchi Sea are important to a variety of species—including all birds, fish, and marine mammals, generally, and keystone subsistence species such as bowhead whales, beluga whales, and walrus, specifically. *See supra* at 9-10. As a result, BOEM could not fully assess how disturbance or oil spills from the lease sale may affect a wide variety of species in the Chukchi Sea. For marine mammals generally, for example, the EIS stated BOEM was "unable to determine at this time if significant impacts would or would not occur" because of "the paucity of information available on marine mammal ecology, and specifically on habitat use patterns." V-ER-896. *See also* V-ER-942, 947 (similar). The EIS acknowledged the same for nearly all other species. V-ER-877 (stating for fish "[g]iven a lack of contemporary abundance and distribution information, effects on rare or unique species (including potential extirpation) could occur, but it would likely go unnoticed or undetected"); V-ER-896 (birds); V-ER-959 (stating "we cannot evaluate the cumulative effects on bowhead whales resulting from multiple noise and disturbance sources" due to incomplete data); VI-ER-1071 (agreeing that "we lacked the appropriate data (i.e., timing, distribution, and species composition and abundance) on whales to be of much value relative to oil-spill risk analysis").

12

> 3.      *Missing information constrained BOEM's comparison and development of lease sale alternatives*

The EIS considered three action alternatives—the proposed action (Alternative I) and two deferral alternatives (Alternatives III and IV)—that each deferred leasing in three different-sized areas along the coast.  V-ER-779-80, 787, 991a-c.  The proposed action deferred leasing from a corridor extending to about 25 miles from the coast, Alternative III from an area about 60 miles from the coast, and Alternative IV from an area between 25 and 50 miles from the coast.  III-ER 413.  The Secretary ultimately chose the hold the lease sale according to Alternative IV.  IV-ER-763; III-ER-447.

The alternatives as designed were an attempt, based on the limited available information, to consider differing degrees of adverse effects to a variety of species by removing from the lease sale areas BOEM could identify as potentially important habitat.  V-ER-787 (noting that deferral areas "attempt to reduce potential impacts to subsistence hunting . . . as well as various wildlife species and associated habitat"); V-ER-789 (stating that the coastal deferral alternatives encompass areas where whales are "concentrated and particularly vulnerable to disturbance, such as calving areas, molting and brooding areas, and feeding areas").  However, the EIS disclosed that the agency's ability to contrast the impacts of these alternatives and develop other alternatives that minimize adverse

13

effects was constrained by the many data gaps about the habitat use of Chukchi Sea species.

a.     Comparison of lease sale alternatives

The EIS demonstrates that missing information hindered comparison of differences in effects among the coastal deferral alternatives. BOEM primarily analyzed the impacts of the lease sale in the proposed action (Alternative I) section of the EIS. V-ER-851-54. It then compared the impacts of the two additional alternatives (Alternatives III and IV) to the proposed alternative and to each other in a ten-page section of the EIS. V-ER-940-49. For non-ESA-listed marine mammals, fish, and birds, the limited available information allowed the EIS to compare the alternatives only generally and not at the species level. V-ER-941-42, 945, 947. The comparison consisted of a conclusion for each group that larger coastal deferral areas would provide "the greatest net resource benefits." *Id.* The EIS supported this conclusion with two observations, repeated verbatim for each coastal deferral alternative and for each of fish, birds, and marine mammals:

> The primary benefit of this corridor is that it would move sources of potential adverse effects further away from important . . . habitats.

> The increased distance between offshore development and coastal . . . habitats conceivably would decrease the percent chance of spilled oil contact, increase weathering of spilled oil prior to contact, and increase available spill-response time.

*Id.*

14

The species-level comparison of alternatives for ESA-listed whales and birds also concluded that the larger the deferral area, the greater the reduction of effects, based also on the general observations that the deferral corridors would move industrial noise further from coastal habitat areas and allow more time for response in the event of an oil spill. *See* V-ER-941-42, 946-47.

> b. Formulation of lease sale alternatives

The EIS stated that the alternatives it analyzed were designed to include those areas in the Chukchi Sea where species "are concentrated and particularly vulnerable to disturbance, such as calving areas, molting and brooding areas, and feeding areas." V-ER-789. *See supra* at 3. Accordingly, the alternatives in the EIS distanced the lease sale industrial activity from the spring coastal migration corridor, which is important to bowhead whales and other species, V-ER-941, 946, and where industrial activities could have significant effects, V-ER-883, 886. The EIS also stated that other non-coastal areas in the Chukchi Sea, like offshore aggregation areas, are also important to species, including bowhead whales, beluga whales, and walrus. *See, e.g.,* ER 882-84 (bowhead whales), ER 911 (whales generally), ER 826 (walrus). It recognized deferring leasing of these areas could minimize the effects of the lease sale. *See, e.g.,* V-ER-906 ( "avoiding impacts to important feeding areas would provide considerable benefits to cetaceans"); V-ER-907 ("marine 'protected areas' could play a role in reducing 'take' of cetaceans, as

15

long as these areas are located where whales concentrate their feeding activities" and "[s]uch areas would greatly help to mitigate potential impacts to cetaceans from human activities"). *See also supra* at 10-11  However, missing information prevented BOEM from identifying important offshore areas for species or effects of oil activity there.  *See supra* at 9-10, 12.  The EIS alternatives analysis stated for example that "because of the lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas."  V-ER-942, 947.  The EIS did not develop alternatives that minimize lease sale effects on these areas.  V-ER-942, 947.

During the preparation of the EIS, some within BOEM voiced concern about the limited data informing the formulation of alternatives.  V-ER-1010-11 (analyst email stating "I think the internal negotiations to establish deferral area boundaries are sensitive because they may not be grounded in solid science").  Other agencies also expressed concerns about the formulation of lease sale alternatives.  The Environmental Protection Agency (EPA) submitted comments addressing the draft EIS noting that it was "unclear how the boundaries of the excluded areas in the two alternatives (Alternatives III and IV) were determined," V-ER-965-66, and suggested that BOEM "consider removal of additional areas with sensitive fish and wildlife, subsistence, and cultural resources, and at a minimum, deferring areas

16

until further research and studies are conducted to ensure development can occur without significant impacts to critical resources," V-ER-788.

B.     BOEM's initial failure to address missing information

Initially, BOEM failed to assess whether any of these hundreds of items of missing basic information acknowledged in the EIS were "essential to a reasoned choice among alternatives" for the lease sale pursuant to Section 1502.22. 40 C.F.R. § 1502.22. The district court concluded that BOEM's failure to do so "was arbitrary" in light of the "dozens if not hundreds of entries [in the EIS] indicating a lack of information about species/habitat, as well as a lack of information about effects of various activities on many species," and remanded the decision to the agency. I-ER-23-24, 26-27.

C.     BOEM's approach to missing information on remand

On remand, BOEM did not revise the 2008 lease sale EIS or obtain additional information to remedy the data gaps. It continued to rely on the analysis of effects in the EIS, including the alternatives it considered. II-ER-132, II-ER-141; III-ER-417-19.[2] Instead, early in the process BOEM decided to create a separate document to demonstrate compliance with Section 1502.22. III-ER-405;

---

[2] During the administrative process for the 2011 remand SEIS, reviewers from the National Oceanic and Atmospheric Administration reiterated the concern EPA had raised in the 2008 EIS process about the limits of the alternatives, noting that the coastal deferral alternatives provide no additional protection to polar bears, walruses, and ice seals, which prefer offshore sea-ice habitats. II-ER-315; II-ER-320.

17

III-ER-401. *See also* III-ER-403. BOEM decided it would develop standard justifications that it could apply to each of the acknowledgments of missing information in the EIS, III-ER-392-93, to support its conclusion that none of the acknowledged missing information is essential, *see* III-ER-399-400; III-ER-394-97; III-ER-383-91; III-ER-381-82. This document eventually took the form of an appendix to a SEIS. III-ER-373-76; II-ER-310-14, II-ER-209-308. The appendix listed all of the EIS's statements about missing information, running to nearly 100 pages, and for each acknowledged gap, it stated the gap was either not relevant to significant adverse effects or not essential on the basis of one or more of the five standard justifications BOEM had developed early in the remand process. II-ER-209-308. The most common justification was that despite the gap, BOEM had "sufficient information to support sound scientific judgments and reasoned managerial decisions." II-ER-213. The four other justifications stated various reasons why BOEM could proceed in the absence of information: because of (1) a "presumption that adverse effects would certainly occur" for oil spill impacts; (2) a "commonality of potential impacts amongst all action alternatives;" (3) "[t]he existence of other environmental laws and regulations that would preclude significant adverse effects on particular resources;" and (4) "[t]he understanding that certain items of presently missing or incomplete information will be known . . . at a later stage of O[uter] C[ontinental] S[helf] Lands Act." II-ER-213-14. On

18

the basis of these five justifications, the SEIS concluded that "while many items of incomplete, missing, or unavailable information [identified in the EIS] were broadly relevant to the important issues at hand, none were essential." II-ER-140. *See* II-ER-211.

### 1. BOEM's response to agency comments questioning its "not essential" conclusions

Early in the administrative process, staff at BOEM's Washington, D.C., headquarters raised concerns about how the standard responses, particularly the first response, contradicted acknowledgments in the EIS. III-ER-369-71. The comments noted, for example, that "you can't say information is unknown and then turn right around and say . . . 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions.'" III-ER-370. *See also id.* ("If site specific data is lacking and most information is 15-30 years old, we cannot just say 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions.'"); *id.* ("Repeatedly the statement is made that information is lacking or outdated, followed by 'sufficient information is available to support sound scientific judgments and reasoned managerial decisions.' This is unacceptable. This entire table should be scrutinized to eliminate such contradictory statements."). Commenters from the National Marine Fisheries Service also noted the conflict between the EIS's statements that information was missing and the SEIS's

19

statements that information sufficed. II-ER-321-22 (noting tension with respect to seismic surveying effects on fish). BOEM did not modify its approach in response to these comments. *Compare, e.g.*, III-ER-370 (headquarters' comments, first row, noting that if "most information is 15-30 years old, we cannot just say 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions'") *with* Ex. II-ER-272 (final SEIS, responding to EIS statement that bird data is 15-30 years old with the statement that "sufficient" information is available "to support sound scientific judgments"). *See also* II-ER-215.

### 2. *BOEM's response to a parallel United States Geological Survey assessment of Arctic missing information*

At the same time that BOEM was reconsidering the importance of missing information in the Chukchi Sea, the United States Geological Survey (USGS) embarked on a comprehensive assessment of information needs in the Arctic Ocean. III-ER-323-36. The assessment was commissioned by the Secretary for the purpose of "conduct[ing] an initial, independent evaluation of the science needs that would inform the Administration's consideration of the right places and the right ways in which to develop oil and gas resources in the Arctic O[uter] C[ontinental] S[helf]." III-ER-326.

The assessment culminated in a final report, published several months before the conclusion of BOEM's remand process, that confirmed significant data gaps in

20

the Arctic Ocean for a large number of species. For example, for marine mammals generally, "seasonal, annual, and geographic variability in diet are poorly quantified and foraging areas are poorly described," III-ER-344; for bowhead whales, "the understanding of essential spatial and temporal habitat needs . . . particularly the oceanographic parameters that most influence foraging, breeding, raising young, and migrating is not yet sufficient to confidently determine the times and places where whales might be most impacted by anthropogenic sounds," III-ER-358, 354; for beluga whales, "[t]he present understanding of essential spatial and temporal habitat needs . . . is limited and constrains the ability to confidently understand and efficiently mitigate potential anthropogenic noise impacts," III-ER-360; and for fish, "[i]nformation about status and trends, habitat requirements, relative distribution and abundance, and knowledge of life history stages . . . is incomplete and unavailable for large expanses of Arctic nearshore and shelf waters," III-ER-352. It reached similar conclusions for a host of other species. *See, e.g.*, III-ER-361 (gray whales); III-ER-362 (ice seals); III-ER-365 (walrus); III-ER-344-51 (birds generally). Recognizing the scope and importance of the data gaps, the report stated that missing information serves as a "major constraint[] to a defensible science framework for critical Arctic decision making." III-ER-353.

21

BOEM did not attempt to collaborate with USGS or adapt its concurrent administrative process to incorporate the parallel USGS assessment. The agency concluded the USGS report was not relevant to the remand process, stating "[t]he USGS report does not . . . alter BOEM[]'s assessment of whether current information is adequate to support a decision on Lease Sale 193." II-ER-308c. *See also* II-ER-114 (no "show stopper" in the USGS report).

> ### 3. *The Secretary adopted BOEM's conclusions.*

At the end of the remand process, the Secretary adopted the SEIS's conclusion that none of the missing information identified in the EIS was essential to a reasoned choice among alternatives in his record of decision and affirmed the original lease sale decision in its entirety, without changes, and in continued reliance on the EIS for the sale. III-ER-427 ("Since none of the incomplete or unavailable information referred to in the Sale 193 FEIS was determined essential to a reasoned choice among alternatives, BOEM concludes that none of the incomplete or unavailable information could have reasonably led to a different decision than that made for the Final Notice of Sale for Chukchi Sea Sale 193, dated January 2, 2008."); III-ER-446-47.

## IV. THE ASSUMPTIONS UNDERLYING BOEM'S ANALYSIS OF IMPACTS OF THE LEASE SALE

A central feature of the EIS BOEM prepared for the lease sale was a "scenario," or forecast, of oil and gas activities BOEM predicted could occur as a

22

result of the lease sale. The purpose of the scenario was to provide "a common basis for the analysis of potential environmental impacts" of the lease sale decision. V-ER-856. The scenario set out specific oil and gas activities that could occur as a result of the lease sale, including seismic surveying, exploration drilling, development drilling, pipelines, and vessel and aircraft traffic. V-ER-856-75, 981-82. The EIS then analyzed the potential effects of the types and level of activities contained in the scenario. The degree of impact to the environment described in the EIS, from disturbance to catastrophic oil spills, is entirely based on the assumed level and type of activity set forth in the scenario. V-ER-856-75.

The EIS indicated that assumed level of activity is as a general matter "strongly influenced by the petroleum resource characteristics of the area." V-ER-857. For the Chukchi Sea, the EIS projected the resource estimates as ranging between 2.37 billion barrels of oil at a price of 46 dollars per barrel and 12 billion barrels of oil at a price of 80 dollars per barrel, with a middle estimate of 8.38 billion barrels of oil at 60 dollars per barrel, V-ER-1015-17; V-ER-857-58. BOEM concluded that smallest oil field that would support any development in the Chukchi Sea was a field of one billion barrels of oil. V-ER-858 ("lower oil volumes [than one billion barrels] are not likely to be economic"). *See also* V-ER-1020 ("we assume that the discovery of a billion barrel field is needed for development to be economically feasible"). The EIS also projected that additional

23

development would follow any initial field. V-ER-857-58 ("When the first project overcomes the cost, logistical, and regulatory hurdles, more projects are more likely to follow . . . and the industrial footprint expands away from the core area.").

The scenario used by BOEM as the foundation of its effects analysis in the EIS, however, was not tied to the petroleum resource estimates for the area or to BOEM's description of how development would occur once the minimum-sized oil field was discovered and developed. Instead, BOEM limited the scenario to the development of the minimum amount of oil—one billion barrels—it deemed necessary to support any development at all. V-ER-858. The scenario "is not tied to a resource assessment or oil price range. It is simply the approximate size of the first, standalone offshore oil field in the Chukchi province." V-ER-1012. *See also* VI-ER-1054; V-ER-973 ("The 1 Bbbl scenario is not tied to a specific oil price but is based on the concept that a very large oil field would have to be discovered to allow initial commercial development in this challenging area."). The analyst who developed the scenario stated this approach "means far lower resource recovery and associated activities than the full economic potential . . . ." VI-ER-1053.

BOEM's approach to the Chukchi Sea lease sale scenario was a departure from its past practice in Arctic lease sale EISs. *See* VI-ER-1054 (internal email noting that "bas[ing] the scenario on the 'first development' not the total economic

24

potential . . . is another departure from previous work []"). In the past, BOEM based lease sale EIS scenarios on the estimates of the amount of economically recoverable resources present in the area to be leased, stating "[r]esource estimates serve as the focus of the assumed exploration and development activities that are fundamental to a rigorous assessment of the potential effects of a proposed sale." IV-ER-628. *See also* IV-ER-613-14, 623-30; IV-640-41, 646-47. For example, earlier Chukchi Sea lease sale EISs analyzed several different scenarios for different resource estimates, one each for a low range estimate, which was "a minimum resource volume of hydrocarbons likely to be present," a base range estimate, which was "a most likely amount of hydrocarbon resources that is assumed to be developed if commercial quantities of hydrocarbons are discovered," and a high case, which was "a maximum resource volume of hydrocarbons likely to be present in commercial quantities." IV-ER-617. *See also* IV-ER-613-16, 619-20; IV-ER-646 (tying the base case scenario to "the conditional-mean-resource estimate of economically recoverable resources in the Sale 109 area"), IV-ER-645. The amount of oil and gas activity forecast differed under each scenario, ranging from a minimum amount of activity in the low case to a maximum amount of activity in the high case. *See* IV-ER-615-16 (table showing different forecast levels of infrastructure at different resource estimates); IV-ER-642-44, 648-52 (same). Similarly, an EIS evaluating three lease sales in the

25

Beaufort Sea based its scenario on a midrange of economically recoverable resources in the lease sale area, analyzing three development projects per lease sale. VI-ER-1070 ("Resource estimates assumed to be discovered and developed for each of the proposed sales vary between 340 and 570 million barrels of oil, assuming market prices ranging between $18 and $30 per barrel (in 2000$). For purposes of analysis, the [BOEM] has assumed that each sale would have the potential to produce 460 million barrels of oil over the lifetime of its field production."); VI-ER-1060 (noting that for the first lease sale, the scenario projects the development of "three new fields ranging in size from 120-220 million barrels of oil").

The record reflects that BOEM's departure from past practices of developing a scenario tied to resource evaluations in the lease sale area was motivated at least in part by a perceived need for speed. An email from the analyst who drafted the scenario to a supervisor notes the need for "a scenario ASAP" and states "You realize that we won't have the 2005 resource assessment numbers until Sept, so we must base the scenario on the 'first development' not the total economic potential . . . ." VI-ER-1054. BOEM developed its scenario for the lease sale early in the EIS process. It appears to have settled on the one billion barrels of oil scenario well before its publication of a notice of intent to prepare an EIS in September 2005. 70 Fed. Reg. 54,406, 54,407 (Sept. 14, 2005) (second col.) (NOI for lease

26

sale EIS). An e-mail exchange from July 21, 2005, suggests that the decision had at that time already been reached to analyze a scenario of just the first development project, untethered from resource estimates, which were not yet available. VI-ER-1053 (e-mail noting "We are planning to propose a scenario for only the first development project (similar to the Cook Inlet approach) which means far lower resource recovery and associated activities than the full economic potential (revised estimates will not be available until Sept anyway)" followed by a "Yes" response). By the beginning of August, 2005, the agency appears to have settled on the one billion barrels of oil assumption underlying the development scenario. V-ER-1043-49 (noting "[h]ere are the revised text and table for the single case, following our discussion this morning" and attaching a description of the scenario based on the one billion barrels assumption).

Commenters from inside and outside the agency questioned BOEM's decision to analyze the environmental effects of only the minimum amount of oil necessary to induce any development. A BOEM analyst emailed BOEM's Chief of Environmental Assessment early in the EIS process questioning BOEM's analysis of the effects of just the minimum amount of development, asking: "If it becomes economical to build one platform to produce an estimated 1 billion barrels, and there is between 12 and 29 billion barrels that are recoverable, why is the scenario not compelled to imagine more than one platform (i.e. is a single

27

platform *always* the initial scenario, in which case maybe we should just explain that)?" V-ER-1031. Public commenters also later raised the issue. V-ER-971. Although the scenario underwent some changes over the first few months of the EIS process, the basic one billion barrels assumption contained in the initial August, 2005, draft scenario remained unchanged. V-ER-1033-35; V-ER-1027-29; V-ER-1022-26.

V.   APPELLANTS' INTERESTS

Appellants have standing to challenge the decision because their members use the Chukchi Sea and wildlife from the area for subsistence, recreation, wildlife viewing, education, research, photography, artistic inspiration, or aesthetic and spiritual enjoyment. *See, e.g.,* IV-ER-597-600; IV-ER-586-87; III-ER-579-81; III-ER-574-76; III-ER-568-70; III-ER-534-37, 543-44; III-ER-521-29; III-ER-512-15. Appellants and their members are injured and adversely affected by the Secretary's decision to hold the Chukchi Sea lease sale because their use and enjoyment of these areas will be adversely affected by lease sale activities. IV-ER-600-03; IV-ER-588-90; III-ER-583; III-ER-571-72; III-ER-553-54, 557-59, 561; III-ER-544-45; III-ER-527, 529-31.

## SUMMARY OF ARGUMENT

BOEM violated NEPA by failing to assess adequately the potential environmental impacts of the lease sale in two central respects. First, it violated a

28

binding CEQ regulation, Section 1502.22, by failing to properly account for the vast amounts of missing information about the basic ecology of the Chukchi Sea. Section 1502.22 sets forth procedures agencies must follow when confronted with missing information. It requires agencies "evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement" to determine whether missing information "relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives." 40 C.F.R. § 1502.22. If it is, the agency "shall include the information in the environmental impact statement" if "the overall costs of obtaining it are not exorbitant." *Id.* Here, the EIS BOEM prepared for the lease sale contained "dozens if not hundreds of entries indicating a lack of information about species/habitat, as well as a lack of information about effects of various activities on many species." I-ER-23-24, 26-27. It demonstrated that missing information rendered BOEM unable to compare alternatives meaningfully or formulate alternatives to minimize adverse effects. After first failing to even assess whether any of the missing information was essential to a reasoned choice among alternatives—which the district court determined "was arbitrary," I-ER-23-24, 26-27—BOEM on remand concluded, without altering the EIS's analysis or obtaining data to fill the gaps, that not a single piece of missing information identified in the EIS was essential to a reasoned choice among alternatives. This

29

conclusion cannot be squared with the analysis in the EIS, and BOEM's attempts during the remand to justify the conclusion do not remedy the conflict.

Second, BOEM violated NEPA because, departing from past practice, it based its analysis of the environmental effects of the sale on a forecast of lease sale oil and gas activity that arbitrarily assumed that oil development would occur as a result of the lease sale only at the minimum possible level. The assumption contradicted the agency's own analyses in the record. As a result of the arbitrary assumption underlying the agency's forecast, the agency seriously understated the potential industrial activity that could result from the sale. The agency analyzed the effects of industrial activities associated with the discovery, development, and production of one billion barrels of oil even though the agency itself projected that twelve times that amount could be economic to produce. In so limiting the analysis, the EIS misleadingly understated the potential impacts of the sale, ranging from population-level disturbance of wildlife to the risk of a catastrophic oil spill.

## ARGUMENT

## I.    STANDARD OF REVIEW

The district court rendered summary judgment in Appellees' favor. This Court reviews district court decisions granting summary judgment *de novo*. *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1302 (9th Cir. 1994).

Judicial review of Appellants' claims is governed by the Administrative Procedure Act, 5 U.S.C. § 706(2) (APA). *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004). Under the APA, courts are to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The Court's review under the APA "is narrow but searching and careful." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) (internal quotation marks omitted). An agency's action is arbitrary and capricious, *inter alia,* "if the agency offers an explanation for the decision that is contrary to the evidence, [or] if the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

II.  BOEM'S CONCLUSION THAT NONE OF THE MISSING CHUKCHI SEA INFORMATION IS ESSENTIAL TO A REASONED CHOICE AMONG ALTERNATIVES FOR THE LEASE SALE IS ARBITRARY

In affirming the Chukchi Sea lease sale, the Secretary arbitrarily concluded that, notwithstanding the acknowledged critical gaps in basic information about the Chukchi Sea that preclude effective comparison and formulation of alternatives, none of the missing information was "essential to a reasoned choice among alternatives," 40 C.F.R. § 1502.22, for the lease sale. Under the regulation

31

information is essential if it is needed to meet NEPA's requirement to make an informed comparison of alternatives and to develop alternatives that would avoid or minimize adverse impacts from the action. At the lease sale stage, the key decision is how to strike the balance between protection and development of offshore areas. BOEM's alternatives analysis must inform that key spatial choice. Here, the EIS for the lease sale acknowledged that critical information was missing about the areas under consideration for leasing—information like which areas of the Chukchi Sea provide important habitat for species and the effects of oil and gas activities in those areas. The absence of that data precluded effective analysis of alternatives in the EIS in two respects. It prevented BOEM from effectively comparing the three action alternatives it considered in the EIS, and it prevented BOEM from developing different alternatives to minimize adverse effects. Absent some different analysis than that contained in the EIS, the conclusion that not a single piece of missing information is essential to the lease sale decision contradicts the EIS and is arbitrary.

BOEM here did not, however, conduct any additional analysis, revise the EIS, or fill the identified data gaps. Instead, to justify its conclusion that not a single piece of missing information was essential, it created a separate appendix to a SEIS that provided five boilerplate justifications, repeated in varying combinations for each acknowledgment of missing information in the EIS. II-ER-

32

211-14. These five recurring justifications either directly contradict the analysis in the EIS, and thus "offered an explanation . . . that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or avoided the agency's lease sale NEPA obligations, and thus were "not in accordance with law," 5 U.S.C. § 706(2)(A). BOEM's "not essential" conclusion thus violated NEPA.[3]

A.      Section 1502.22 furthers NEPA's basic requirement that an EIS contain an informed comparison of alternatives and alternatives that avoid or minimize adverse effects

Section 1502.22 sets out an agency's obligations when preparing an EIS in the face of incomplete or unavailable information.[4]  *See Montana Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559-561 (9th Cir. 2011).  It requires agencies "evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement" to determine whether missing information "relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives." 40 C.F.R. § 1502.22.  "As long as the information is 'important,' 'significant,' or 'essential,' it must be provided

---

[3] The Court, of course, need not, indeed cannot in the first instance, decide what information is essential to the lease sale decision.  The question to be decided in this case is only whether the agency has arbitrarily concluded that none of the missing information is essential.

[4] The CEQ Regulations implementing NEPA are "mandatory regulations" binding on all federal agencies.  *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979); 40 C.F.R. § 1500.3.

33

when the costs are not exorbitant in light of the size of the project and/or the possible harm to the environment." *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1244 n.5 (9th Cir. 1984). By stating the obligation in terms of information "essential to a reasoned choice among alternatives," 40 C.F.R. § 1502.22(a), Section 1502.22 links its requirement to the alternatives analysis that is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. *See also* 51 Fed. Reg. 15,618, 15,621 (Apr. 25, 1986) (Section 1502.22 furthers NEPA policy goals and early NEPA case law). Thus, the determination of what information Section 1502.22 requires agencies to obtain—what is "essential"—necessarily turns on the information needed to meet NEPA's obligation to examine alternatives.

There are two key components to NEPA's alternatives requirement that together define "essential" information. First, NEPA requires an EIS to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public" and to "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14. Information is "essential" consistent with this mandate, therefore, if it is necessary to allow an EIS to "make an informed comparison of the alternatives." *Se. Alaska*

34

*Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1058 (9th Cir. 2011) (quotation marks and citation omitted).

Second, NEPA requires an agency to develop alternatives to its projects that would *minimize* environmental impacts.  40 C.F.R. § 1502.1 (EIS must "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."). *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005) (remanding decision to agency where lack of accurate information rendered an EIS unable to "inform[] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts") (internal quotation marks and citations omitted); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809-10 (9th Cir. 1999) (EIS must analyze "effects of the actions in sufficient detail to be 'useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts.'") (quoting *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997)).  Thus, information is also "essential" if it is necessary to permit development of alternatives that provide options to minimize impacts.

B.   Missing information about the Chukchi Sea constrained BOEM's comparison and development of lease sale alternatives, and therefore the agency's conclusion that none of the missing information is essential to the choice among alternatives is arbitrary

Two basic points establish that BOEM's "no essential missing information" conclusion is arbitrary: (1) information is essential at the lease sale stage if it is needed to assess differences in oil and gas development effects among different areas under consideration for leasing; and (2) the EIS admitted that much of this information is missing for the Chukchi Sea, which precluded BOEM from effectively comparing and formulating alternatives in the EIS.

1.   *At the lease sale stage of offshore development, information is essential if it is needed to assess differences in the effects of oil and gas development in different areas under consideration for leasing*

A lease sale, the second of four stages in the offshore development process under OCSLA, is a decision about whether, where, and how to offer offshore areas for oil development. It is fundamentally a spatial decision that balances development and environmental protection for different geographical areas under consideration. *See Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (lease sale is the "critical stage" in which the government makes an "irreversible and irretrievable commitment of resources" toward opening an area to oil and gas activity) (quotation marks omitted). *See also* V-ER-859 ("[r]emoving areas from leasing will eliminate the chance that

36

commercial development will occur in that particular area"); V-ER-1020 ("at the

lease sale stage, alternatives analyze different combinations of geographic

deferrals, mitigation measures, or both—actions from which the Secretary can

choose regarding the timing, area, and conditions for leasing").[5] Because

OCSLA's "staged development encourages staged consideration of uncertain

environmental factors," *Vill. of False Pass v. Clark*, 733 F.2d 605, 616 (9th Cir.

1984), the type of information that is "essential" for purposes of Section 1502.22

varies at each stage. In light of the choice at this stage, information is essential for

a lease sale if it is needed to assess the effects of oil and gas development in

different areas under consideration. Without that information, BOEM cannot

effectively compare alternatives that offer different areas for leasing or develop

alternatives that minimize adverse effects by deferring especially important areas

from leasing.

---

[5] Once the Secretary has made the lease sale decision to open an area for oil activity, he is obligated to follow OCSLA's specific procedures for considering oil activities in the areas under lease, *see, e.g., Mobil Oil & Producing Se., Inc. v. United States*, 530 U.S. 604, 620-21 (2000), and he can only suspend or cancel leases after making specific findings of environmental harm, 43 U.S.C. § 1334(a), *Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 752 (9th Cir. 1975). In other words, while the Secretary can make other, different, decisions at later stages—like how to allow exploration drilling and development—he can only exercise his full discretion to defer altogether oil and gas activities in an area at the lease sale stage.

37

2.    *The EIS for the lease sale acknowledged that missing
information precluded full assessment of the effects of oil and
gas activities and the absence of that information seriously
limited BOEM's alternatives analysis*

Here, BOEM's acknowledgements in the lease sale EIS manifestly

demonstrate that basic data are missing about what areas are important to species

in the Chukchi Sea, *see supra* at 9-10, making the effects of oil and gas

development in those areas uncertain or unknown for a wide variety of species, *see*

*supra* 10-12; I-ER-22-23.  The absence of that information seriously limited

BOEM's alternatives analysis in two respects.

First, missing information, including data gaps for key species like bowhead

whales, beluga, and walrus, undermined BOEM's ability to "make an informed

comparison" of the alternatives it analyzed in the EIS.  *Se. Alaska Conservation*

*Council*, 649 F.3d at 1058.  Missing information largely precluded analysis of the

effects of the proposed action altogether in the EIS.  *See supra* at 10-12.  *See also,*

*e.g.,* V-ER-896 ("Based on the paucity of information available on marine

mammal ecology, and specifically on habitat use patterns, in the Chukchi Sea . . .

we are unable to determine at this time if significant impacts would or would not

occur to marine mammal populations in the project area as a result of the Proposed

Action."); II-ER-493-510 (compendium of EIS acknowledgments of unknown and

uncertain effects).  The information vacuum necessarily also seriously limited

effective comparison among alternatives.  The EIS considered the proposed action

38

and two alternatives, all three of which deferred varying sized areas along the Chukchi Sea coast. *See supra* at 13. But because the EIS could not analyze effects of oil and gas activity under the proposed action to begin with due to missing information, it also could not meaningfully describe how deferring those activities from the different coastal areas in each alternative would vary effects. Indeed, it devoted only a few paragraphs to the effort. *See* V-ER-940-949. Those paragraphs concluded only the obvious—that the larger the deferral area, the greater the amount of benefit associated with protecting some known important coastal areas. *See supra* at 14-15. The conclusion was based on the observation, repeated for each alternative—verbatim for non-ESA-listed birds, fish, and mammals—that because the deferral alternatives did not offer leases in the coastal buffer areas, effects of industrial activity would occur "further away" from those areas, "conceivably" minimizing their effects there. *Id.* Missing information precluded any more meaningful comparison.

Second, missing information hamstrung BOEM's formulation of "alternatives which would avoid or minimize adverse impacts" to species. 40 C.F.R. § 1502.1. BOEM designed the three limited alternatives it considered in the EIS to protect areas it recognized, based on limited information, provide important habitat for a variety of species. *See supra* at 13, 15. But it acknowledged that other areas outside the coastal deferral zones it analyzed are also important for a

39

number of species including bowhead whales, beluga whales, and walrus, *see supra* at 15, and that oil and gas activities that disturb species' use of these areas could have serious negative effects. *See supra* at 10-11, 15-16. It acknowledged, however, that "because of the lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas." V-ER-942; V-ER-947 (same). *See also supra* at 9-10, 12. Because of missing data about the location and species' use of these offshore areas, BOEM was unable—as other agencies noted, *see supra* at 16, 17 n. 2—to formulate alternative deferral areas that would minimize effects to species using these offshore areas.

The EIS thus demonstrates that missing basic information about the importance of different habitat areas in the Chukchi Sea and the effects of oil and gas activities in those areas seriously limited BOEM's comparison and formulation of lease sale alternatives. Absent different or additional analysis than that contained in the EIS, the conclusion that not a single piece of missing information is essential to the lease sale thus contradicts the analysis in the EIS and is arbitrary.

C.    BOEM's five boiler-plate explanations in the SEIS appendix fail to justify BOEM's "not essential" conclusion

In reconsidering missing information in the SEIS, BOEM did not modify the analyses in the EIS or fill the gaps the EIS identified. Instead, immediately after being ordered by the district court to conduct a Section 1502.22 analysis and

40

without coordinating with a parallel USGS comprehensive assessment of information needs for oil development decisions in the Arctic Ocean, *see supra* at 20-22, it sought to justify a conclusion that not a single piece of missing information about the Chukchi Sea identified in the EIS is essential to a reasoned choice among alternatives. It did so solely by applying one or more of five boilerplate justifications to each of the EIS's many acknowledgments of missing information. *See supra at* 17-19; II-ER-213-14. The first and primary is an unsupported assertion inconsistent with the analysis in the EIS that BOEM has sufficient information despite the data gaps. The four others are flawed excuses about why the agency can proceed in the absence of the information that do not reflect the agency's NEPA obligation at the lease sale stage. These defenses, offered by BOEM to "shor[e] up [the] EIS for the 2008 lease sale," III-ER-366, do not justify the agency's conclusion in light of limits of the EIS.

The first and most frequently used justification is that, notwithstanding the data gaps, there is "sufficient information to support sound scientific judgments and reasoned managerial decisions," so the missing information is not essential. II-ER-213. But as the EIS itself demonstrates, missing information constrained BOEM's ability to make informed comparisons among alternatives and design alternatives that avoid or minimize adverse effects. *See supra* at 14-17. BOEM cannot, therefore, based on the EIS, reasonably conclude no missing information is

41

essential to a reasoned choice among alternatives. The assertion in the SEIS, repeated regularly and never with support, that BOEM has sufficient information, cannot be squared with the EIS's analysis. BOEM never explained why the information it has allows it to choose among and design alternatives in the face of substantial data gaps. As a headquarters' staff member who reviewed the SEIS stated, "you can't say information is unknown and then turn right around and say . . . 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions.'" III-ER-370. *See supra* at 19-20. But this is just what the assertion in the SEIS amounts to. Without supportive analysis on each key issue, BOEM's bare assertion that it has the information it needs for the decision conflicts with the analysis in the EIS and is therefore arbitrary. *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008), *overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008). *See State Farm*, 463 U.S. at 43; *FCC v. Fox Television Stations*, 556 U.S. 502, 537 (2009) ("An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past[.]") (Kennedy, J., concurring); *id*. at 551 (same) (Breyer, J., dissenting). *See also Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 893 (9th Cir. 2007) (noting "[w]e have repeatedly explained that generalized, conclusory assertions from agency experts are not sufficient").

BOEM's other four statements each offer a different excuse—none of them consistent with the agency's NEPA obligations for a lease sale—explaining why BOEM believes it can proceed without important missing information. First, BOEM states for many data gaps that missing information is not essential because it can be obtained at later stages of the OCLSA offshore oil and gas development process. II-ER-213. But this statement ignores the nature of the decision being made at the lease sale stage. At the lease sale stage, the Secretary is deciding what areas to open for oil and gas activities. *See supra* at 36-37. Before a lease sale, he has broad discretion to decide if, when, where, and how oil and gas development will proceed in an area. *Id*. After a lease sale, his decisions are more constrained—he can no longer exercise his full discretion to defer oil and gas activities in an area. *Id. Compare* 43 U.S.C. § 1344(a) (setting forth considerations that guide leasing decisions) *with id*. §§ 1334(a)(2), 1340(c)(1)(A), 1351(h)(1)(D) (setting forth the exacting standards governing cancellation of leases, disapproval of exploration plans, and disapproval of development plans). The fact that information can be obtained in the future to inform later, different decisions does not address what is essential to the lease sale decision being made now. In framing alternatives for the lease sale, BOEM recognized the spatial and consequential nature of the lease sale decision in that it created alternatives that defer leasing from those areas it believes provide important habitat for various

43

Chukchi Sea species with the intent of thereby minimizing adverse effects on the species. *See supra* at 13. But BOEM's ability to frame and compare alternatives that might minimize impacts was clearly constrained now by missing information. *See supra* at 14-17. Once the lease sale choice to open an area to oil and gas activity is made, it cannot be made again or differently at later stages of the OCSLA process with more information. Thus, BOEM's statement in the SEIS that it can obtain information later fails to meet the agency's obligation to identify information essential to the reasoned choice among alternatives for the decision here—a lease sale. *Cf. Pac. Rivers Council v. U.S. Forest Serv.*, 2012 WL 2333558, at \*16-17 (9th Cir. June 20, 2012) (noting that "programmatic NEPA documents often play a 'shell game' of when and where deferred issues will be addressed" and holding early-stage EIS that deferred analysis of effects that were "reasonably possible" to analyze at this stage violated NEPA).

Second, BOEM states that some of the missing information is not essential because other environmental laws and regulations would preclude significant adverse effects. II-ER-213-14. This statement misapprehends the agency's obligations under NEPA. An agency may not rely on future permitting processes under other environmental laws to avoid analyzing the impacts of an activity under NEPA. *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (holding EIS violated NEPA where it failed to

44

analyze a project's air quality impacts in reliance on separate Clean Air Act permitting process); *S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1479-80 (9th Cir. 1983) (assessing a NEPA analysis for an herbicide spraying project and rejecting argument that agency could avoid preparing a worst case analysis under pre-amendment Section 1502.22 on the basis that the herbicides were also subject to registration under FIFRA). As the Court recently explained, "use of mitigation measures as a proxy for baseline data . . . contravene[s] [the agency's NEPA] . . . obligation to ensure that data exists *before* approval so that [it] can understand the adverse environment effects *ab initio*." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011); *id.* at 1084 ("Mitigation measures may help alleviate impact *after* construction, but do not help to evaluate and understand the impact before construction.").

Third, for oil spill effects, BOEM consistently states that missing information is not essential to the lease sale decision because adverse effects are presumed significant. II-ER-213. But NEPA requires agencies to make informed comparisons among alternatives and formulate alternatives that would minimize adverse effects. *See supra* at 34-35. BOEM's assumption that adverse effects are significant avoids its obligation to design and compare alternatives that might *reduce* effects. For example, the EIS acknowledged that there may be areas where

45

"bowheads are at particular risk in the event of a large oil spill," but it could not identify those areas, because "the factors associated with the presence of [large aggregations of whales] are not yet clear." V-ER-890. The EIS stated that oil spills contacting aggregations of other marine mammals, such as walrus females and calves, would result in population level impacts. V-ER-907-08. It stated that deferring areas where species aggregate could conceivably reduce the effects of an oil spill to marine mammals by increasing the distance between oil drilling and important habitat areas. V-ER-941-42, 946-47. However, "because of the lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas." V-ER-942, 947. In other words, with some of the missing information, BOEM could potentially develop an alternative with fewer effects in the event of a spill. The excuse that significant effects are presumed thus avoids NEPA's requirement to compare and formulate alternatives that "avoid or minimize adverse impacts." 40 C.F.R. § 1502.1. It does not justify BOEM's conclusion that there is no information missing that is essential to the choice among lease sale alternatives.

Fourth, BOEM states that some missing information is not essential to a reasoned choice among lease sale alternatives because effects among alternatives will be nearly identical. II-ER-213. This justification fails for the same reason as the third excuse, because it avoids the NEPA obligation to compare and design

46

alternatives that minimize effects. As the examples above demonstrate if some of the missing information were available, the agency could assess the potential for differences in effects among alternatives and formulate alternatives to minimize those effects. The assumption that effects among the existing alternatives in the EIS are common thus does not justify a conclusion that none of the missing information is essential.[6]

BOEM's five boiler-plate explanations do not justify its conclusion that not a single piece of missing information acknowledged in the EIS is essential to the choice among alternatives in light of the constraints imposed by missing information on the EIS's ability to make informed comparisons among alternatives and design alternatives that would avoid or minimize adverse effects. The Secretary's affirmation of the lease sale is thus predicated on an unlawful NEPA analysis and is arbitrary and not in accordance with law. *See Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 806 (9th Cir. 2005) (agency must "state a rational connection between the facts found and the decision made") (citation omitted); *Metcalf v. Daley*, 214 F.3d 1135, 1141, 1146 (9th Cir. 2000) (remanding decision for NEPA analysis "not in accordance with law").

---

[6] Additionally, this excuse contradicts the EIS, which concluded, albeit speculatively because of missing data, that alternatives may be different. *Compare* II-ER-215 ("Neither the probability nor severity of [oil spill] impacts [to cetaceans] would vary amongst any of the action alternatives.") *with* V-ER-941-42 (stating oil spill effects under different alternatives could conceivably differ); V-ER-946-47 (same).

III.   THE EIS FAILED TO ANALYZE THE FULL IMPACTS OF THE LEASE
       SALE BECAUSE IT ARBITRARILY BASED ITS ANALYSIS ON
       ACTIVITIES ASSOCIATED WITH ONLY THE MINIMUM AMOUNT
       OF OIL POSSIBLE FOR DEVELOPMENT

BOEM based its scenario—the forecast of lease sale oil and gas activity that

served as the foundation of the EIS's impact analysis—on an arbitrary assumption

that oil development would occur as a result of the lease sale only at the minimum

possible level.  This assumption, a stark departure from past practice driven in part

by a perceived need to rush out the EIS, *see supra* at 26-27, is contrary to the

record in which BOEM predicts substantially more development if it occurs.  The

assumption resulted in the EIS basing its analysis of impacts on the absolute floor

of potential industrial activity.  In so limiting the analysis, BOEM seriously

understated the potential impacts of the sale, ranging from noise disturbance to the

risk of a catastrophic oil spill, misleading the decisionmaker and the public in

violation of NEPA.  *See Pac. Rivers Council,* 2012 WL 2333558 at \*10.

A.     BOEM based the scenario on an arbitrary assumption

The fundamental assumption underlying BOEM's scenario and the resulting

analysis of impacts in the EIS—that oil development would occur as a result of the

lease sale only at the minimum possible level—is not supported by the record.  As

the EIS described, the agency projected economically recoverable oil resources in

the Chukchi Sea to be between double and 12 times the one billion barrel

minimum amount on which BOEM based its scenario here.  *See supra* at 23.

48

Further, the agency admits once "the first project overcomes the cost, logistical, and regulatory hurdles, more projects are more likely to follow." *See supra* at 24. In past analyses of Arctic Ocean lease sales, BOEM grounded its scenario forecast on the amount of economically recoverable resources present in the area to be leased and described the amount of industrial activity that would be associated with developing these resources. *See supra* at 24-26. BOEM's minimum-only scenario here, departing from that past practice, took neither the resource potential nor the likely progression of development into account. Rather, it simply assumed that any development from the lease sale would be limited to development of just the minimum resource, one billion barrels of oil, required to sustain any development at all. *See supra* at 24. The explanations BOEM provided in the EIS do not offer "a rational connection between the facts found and the choice made" that justifies this novel approach. *State Farm*, 463 U.S. at 43 (quotation marks omitted).

The EIS attempted to explain the approach on the grounds that there is no petroleum infrastructure in the Chukchi Sea. V-ER-857-58. This explanation may support the proposition that it will take a large discovery to justify the infrastructure costs of initial development in the Chukchi Sea. It does not, however, justify the analysis of the impacts of only the minimum field. The first field may contain more oil than the one billion barrels BOEM deems necessary to

49

justify any development in the first place—the one billion barrels is a minimum floor. It would also, as BOEM recognized, catalyze further development. *Id*. The EIS did not explain why the impacts associated with the exploration, development, and production of these additional foreseeable quantities of oil may be ignored.

The EIS also attempted to explain untethering the scenario from economically recoverable resource estimates for the Chukchi Sea on the basis that "future development is more likely to be at a lesser scale and over a longer time period than suggested by economically recoverable resource estimates." V-ER-858. *See also* V-ER-857 ("future production from this frontier area is unlikely to ever reach the full economic potential as estimated by petroleum-resource assessments"). While this may justify an approach like that BOEM has used in past Arctic lease sale EISs, *see supra* at 25-26, that analyzes the potential impacts from development of something less than the full economic resource potential of the lease sale area, it does not explain why it is reasonable for BOEM to do what it did for the first time here, namely base its analysis of impacts entirely on the *minimum* amount of development it deems possible.

The EIS suggested that the assumption of a minimum-sized field is reasonable because of the low likelihood that any development would occur at all as a result of the lease sale. V-ER-858-59. But as BOEM recognized in the EIS, its NEPA obligation at the lease sale stage is to analyze the effects of development,

50

"should it occur." V-ER-859. *See also* V-ER-858 (stating the development "scenario assumes active leasing and exploration by industry followed by development"); *Mass. v. Watt*, 716 F.2d 946, 949-50 (1st Cir. 1983). The chance of development occurring, then, is not a factor in determining what development will look like if it does occur. Moreover, the EIS separately informed the decisionmaker and the public that the chances of production occurring as a result of the lease sale are less than ten percent. V-ER-859. It cannot use the low likelihood both to discount the *chance* of development and the *size* of development *should it occur*.

BOEM's minimum development assumption is untethered from the resource estimates and development patterns the agency acknowledged in the record. It is thus arbitrary and deserves no deference. *Lands Council*, 537 F.3d at 992-93*; Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1193 (9th Cir. 2008) (requiring agency to "examine the relevant data and articulate a satisfactory explanation for its action") (quoting *State Farm*, 463 U.S. at 43)*.*

> B. The arbitrary assumption underlying the scenario caused BOEM to misleadingly understate the effects of the lease sale in violation of NEPA

BOEM's flawed decision to base the scenario on the production of just the minimum amount of oil possible caused the EIS to misleadingly understate the lease sale's impacts in two respects. First, it caused BOEM to analyze just the

minimum amount of oil and gas activity, and a correspondingly minimal level of effects, that could result from the lease sale. Second, it caused BOEM to understate the risk of a large oil spill from the lease sale.

As a general matter, the amount of oil BOEM forecasts will be developed from a lease sale determines the level of industrial activity BOEM forecasts will result from the sale. V-ER-857. As the EISs for prior Chukchi Sea lease sales demonstrate, every aspect of forecast industrial activity, from the amount of seismic surveying to the number of production platforms, increases in almost direct correlation with the increase in resource volume estimates. *See supra* at 25-26. For example, the EIS for Chukchi Sea lease sale 126 forecast that two exploration wells would be drilled if resources were estimated to be 430 million barrels of oil but 53 exploration wells would be drilled if resources were estimated to be 3,540 million barrels of oil. IV-ER-613, 615-16. BOEM's decision here to analyze the impacts of just the minimum one billion barrels of oil in the lease sale EIS, even though, for example, the agency projected 12 billion barrels of oil could be economic to develop at 80 dollars a barrel, V-ER-1017, thus potentially vastly understated the level of infrastructure and industrial activity that would result from the lease sale. *See* V-ER-893 ("[a]n increase in exploration, development and production results in a greatly increased amount of marine vessel activity including icebreakers, barges, sealifts, seismic vessels, supply boats, crew boats, and tugs").

In turn, the level of impacts from a lease sale is closely tied to the level of industrial activity. As the EIS here acknowledged, disturbance from oil infrastructure and traffic could have serious effects on a variety of Chukchi Sea species. *See, e.g., supra* at 10-11; V-ER-892; 893 ;905 (whales); V-ER-904 (walrus); V-ER-936-37 (subsistence harvest). The EIS's analysis of only those industrial activities tied to the minimum level of oil development thus misleadingly understated the lease sale's effects. Accordingly, the EIS violated NEPA's "hard look" requirement. *Pac. Rivers Council,* 2012 WL 2333558 at *10 ("a 'hard look' should involve a discussion of adverse impacts that does not improperly minimize negative side effects") (citation and quotation marks omitted).

BOEM's one billion barrels of oil assumption also caused it to understate the risks and impacts of large oil spills. BOEM calculated the risk of one or more large oil spills from two components—a constant spill rate derived from a technical analysis of potential oil spill occurrence in the Chukchi Sea, and resource volume estimates. V-ER-872, 997, 1000-01. It denominated the risk in spills per billion barrels of oil. V-ER-872. In other words, as the resource volume assumption increases, the spill risk and associated impacts increase. Using this formula BOEM modeled the risk for a maximum amount of only one billion barrels of oil, *see* V-ER-872, and concluded that there is a 40 percent risk of one or more large oil spills resulting from the production of that quantity of oil, *id.*; *see*

*also* V-ER-997-1002. Given BOEM's prediction that far more than one billion barrels of oil could be economic to produce from the Chukchi Sea, the EIS's calculation of oil spill risk from production of just one billion barrels of oil greatly understated the risks. *See* V-ER-1002a ("more oil is more spill chance"). *See also* IV-ER-618 (EIS for prior lease sale showing that chance of one or more large oil spills ranges from 87 percent to 99 percent depending on resource amount (base case versus high case)). Given the potentially catastrophic consequences of an oil spill in the Chukchi Sea, *see, e.g.,* V-ER-790, 792-94, 919, 937; V-ER-1005-06, this understatement of the risk fundamentally misled the public and decision-maker about the potential impacts of opening portions of the Chukchi Sea to oil and gas activities.

BOEM's decision to base the scenario underlying its assessment of impacts on the minimum development assumption fails to satisfy NEPA. "'NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done.'" *Pac. Rivers Council*, 2012 WL 2333558, at *13 (quoting *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002)); *id.* at *16 ("programmatic NEPA documents often play a 'shell game' of when and where deferred issues will be addressed") (internal quotation marks omitted). *See also City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) ("[d]rafting an [EIS]

54

necessarily involves some degree of forecasting"). At the lease sale stage, an EIS must give the decision-maker a "clear idea how to visualize the environmental harms" of offshore oil and gas activity. *Mass.*, 716 F.2d at 949. The agency must "provide[] a reasoned analysis of the evidence before" it. *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1192 (9th Cir. 1988) (citation and internal quotation marks omitted). *See False Pass*, 733 F. 2d at 609-10, 613; *State of Cal. v. Watt*, 683 F.2d 1253, 1267-68 (9th Cir. 1982), *rev'd on other grounds sub nom. Sec. of Interior v. Cal.*, 464 U.S. 312 (1984). BOEM's analysis of effects in the EIS based on the assumption of minimum development does not meet this standard.

IV.    BECAUSE THE LEASE SALE WAS AFFIRMED IN VIOLATION OF NEPA AND THE APA, THE COURT SHOULD VACATE THE SALE AND ISSUANCE OF LEASES

Appellants request that the Court vacate the lease sale and the leases issued thereunder and remand to BOEM with direction to comply with NEPA. As explained above, the lease sale was held and affirmed in violation of NEPA. NEPA compliance is reviewed under the APA. *Klamath-Siskiyou Wildlands Ctr*, 387 F.3d at 992. The normal remedy under the APA for an unlawful agency action is to vacate the agency's action and remand to the agency to act in compliance with its statutory obligations. *Cal. Wilderness Coal. v. U.S. Dept. of Energy*, 631 F.3d 1072, 1095-96, 1106 (9th Cir. 2011); *Se. Alaska Conservation Council*, 649 F.3d at 1056, 1059; *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir.

55

1998). *See* 5 U.S.C. § 706(2)(A) (court shall set aside arbitrary or unlawful actions). *See also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001).

Although the Court retains discretion to remand without vacatur where vacatur would cause harm to the environment, *see*, *e.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995), or thwart the objective of the statute at issue, *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980), there is no reason to depart from the normal remedy of vacatur in this case. Here, vacatur would cause no harm to the environment or human health, would preserve the full opportunity for the Secretary to choose among alternatives that is contemplated by NEPA, s*ee Mass.*, 716 F.2d at 951-52 (Breyer, J.), *Houston*, 146 F.3d at 1129, and would further OCSLA's mandate of ensuring "orderly" offshore development "subject to environmental safeguards," 43 U.S.C. § 1332(3).

The Secretary's reconsideration of the lease sale during the district court remand illustrates the appropriateness of the regular vacatur remedy here. The district court remanded but did not vacate the lease sale decision. I-ER-26-27. In the absence of an order from the district court vacating the leases, the government did not—as it must—ensure during its reconsideration of the lease sale that the prior "decision based on a legally insufficient EIS counts for nothing." *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988). To the contrary, it

treated the existence of outstanding leases as a "decision consideration" that was "probably important" to the remand decision because declining to affirm the lease sale "would result in a lease buyback" with "significant cost uncertainty." II-ER-122, 125. The final Record of Decision itself states: "If I decide to cancel or rescind the sale, the Department would have to find it was in error in issuing the leases. To do this, the Department would have to refund over $2.662 billion in high bonus bids and all rental monies collected to date." III-ER-445.[7] The government's prominent consideration of the existence of the unlawfully issued leases and the lessees' investments seriously undermined NEPA's purposes. *See* 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."); *Metcalf*, 214 F.3d at 1143-46 (backfilling environmental review once "the die already ha[s] been cast" violates NEPA); *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785-87 (9th Cir. 2006) (same). To avoid the prejudice the consideration of the outstanding leases introduced into the

---

[7] Whether or not a decision by the Secretary to rescind the sale or portions of it would create any financial exposure for the government is an issue not presented by this case. But these documents indicate that relevant decisionmakers so expected and improperly took into account the lessees' lease sale investments in making the decision on remand. *See N. Cheyenne Tribe*, 851 F.2d at 1157 (stating that lessees' "investments should not be considered [by the Secretary during a reconsideration of a coal lease sale] . . . when the lessees made their bids with full awareness of the . . . suit and chose to gamble on the EIS being adequate").

reconsideration of the lease sale during the first remand, the Court should here vacate the lease sale and the leases issued pursuant to the sale.

In the alternative, the Court should enjoin BOEM from permitting further activity on the leases until the agency remedies the NEPA violations and reconsiders the lease sale in light of a lawful NEPA analysis. The record here itself demonstrates that allowing activities to proceed on leases in the Chukchi Sea pending completion of a new NEPA analysis is sufficiently likely to irreparably injure Appellants. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Id*. Activities on the leases, such as increased vessel and air traffic, seismic surveying, and exploratory drilling, cause harm to the environment, including harm to endangered bowhead whales, threatened polar bears and eiders, beluga whales, and seals, and on subsistence activities of communities that depend on a healthy ocean for their way of life. *See* V-ER-790-95, 878-79, 881-90, 892-93, 895-908, 912-17, 922-29, 932-37, 950-53, 956-57; II-ER-143-208; V-ER-1008-09; V-ER-1006. Appellants' use of the Chukchi Sea for subsistence, scientific, recreational, and spiritual purposes would be impaired significantly if such harm occurred. *See supra* at 28. "If [environmental] injury is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to

58

protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545. This is particularly true here where the Federal Appellees and lessees entered into the lease sale in full knowledge of this suit and "chose to gamble on the EIS being adequate." *N. Cheyenne Tribe*, 851 F.2d at 1157. The public interest also weighs heavily in favor of enjoining lease activities pending BOEM's compliance with the law. OCSLA, pursuant to which the Chukchi Sea leases were issued, declares that the outer continental shelf should be made "available for expeditious and orderly development, *subject to environmental safeguards,*" including NEPA. 43 U.S.C. § 1332(3) (emphasis added). *See also False Pass*, 733 F.2d at 608-09 (describing interplay between NEPA and OCSLA). That policy cannot be met if activities are permitted to continue on leases issued in violation of NEPA.

CONCLUSION

For the forgoing reasons, this Court should vacate the lease sale decision, or in the alternative, enjoin activities under the leases, and remand to BOEM to comply with NEPA.

Respectfully submitted this 23rd day of July, 2012,

> *s/ Erik Grafe*
> Erik Grafe
> Eric P. Jorgensen
> EARTHJUSTICE
>
> *Attorneys for Plaintiffs-Appellants Native Village of Point Hope, et al.*

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(a)(7)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,946 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Respectfully submitted this 23rd day of July, 2012,

*s/ Erik Grafe*

Erik Grafe
EARTHJUSTICE

*Attorney for Plaintiffs-Appellants Native Village of Point Hope, et al.*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Native Village of Point Hope, Inupiat Community of the Arctic Slope, Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, National Audubon Society, Natural Resources Defense Council, Northern Alaska Environmental Center, Oceana, Pacific Environment, Resisting Destruction on Indigenous Lands (REDOIL), Sierra Club, The Wilderness Society, and World Wildlife Fund state that there are no related cases.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2012, I electronically filed the foregoing APPELLANTS' OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I also certify that on July 23, 2012 four (4) copies of APPELLANTS' EXCERPTS OF RECORD were sent by Priority Mail to the Clerk of the Court, U.S. Court of Appeals for the Ninth Circuit, P.O. Box 193939, 95 Seventh Street, San Francisco, CA 94119-3939. One (1) copy was served by Priority Mail on each of the following:

David C. Shilton
U.S. Department of Justice
ENRD – Appellate Section
P.O. Box 7415
Washington, DC 20044

Kyle W. Parker
Crowell & Moring, LLP
1029 W. Third Avenue, Suite 402
Anchorage, AK 99501

Jeffrey Leppo
Ryan Steen
Stoel Rives LLP
600 University Street, Suite 300
Seattle, WA 98101

Rebecca Kruse
Kenneth Diemer
State of Alaska
1031 W. Fourth Avenue, Suite 200
Anchorage, AK 99501

James N. Leik
Perkins Coie LLP
1029 W. Third Avenue, Suite 300
Anchorage, AK 99501

62

Respectfully submitted this 23rd day of July, 2012,

*s/ Erik Grafe*

Erik Grafe
EARTHJUSTICE

*Attorney for Plaintiffs-Appellants Native Village
of Point Hope, et al.*

**[Colored Page in Printed Brief]**

ADDENDUM

| STATUTES | Page(s) |
|---|---|
| 5 U.S.C. § 706(2) | A1 |
| 28 U.S.C. § 1291 | A2 |
| 28 U.S.C. § 1331 | A3 |
| 43 U.S.C. § 1332(3) | A4 |
| 43 U.S.C. § 1334 | A5-11 |
| 43 U.S.C. § 1337 | A12-14 |
| 43 U.S.C. § 1340 | A15-17 |
| 43 U.S.C. § 1344 | A18-19 |
| 43 U.S.C. § 1351 | A20-A26 |

| REGULATIONS | |
|---|---|
| 40 C.F.R. § 1500.3 | A27 |
| 40 C.F.R. § 1502.1 | A28 |
| 40 C.F.R. § 1502.2(g) | A29 |
| 40 C.F.R. § 1502.14 | A30 |
| 40 C.F.R. § 1502.22 | A31 |

| RULES | |
|---|---|
| Fed. R. App. P. 4(a)(1)(B) | A32 |

i

## 5 U.S.C.A. § 706

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

 . . .

 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

 . . .

A1

## 28 U.S.C.A. § 1291

### § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

A2

## 28 U.S.C.A. § 1331

### § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**43 U.S.C.A. § 1332**

**§ 1332. Congressional declaration of policy**

It is hereby declared to be the policy of the United States that--

. . .

(3) the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs;

. . .

A4

## 43 U.S.C.A. § 1334

## § 1334. Administration of leasing

## Effective: August 8, 2005

(a) Rules and regulations; amendment; cooperation with State agencies; subject matter and scope of regulations

The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall, as of their effective date, apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter. In the enforcement of safety, environmental, and conservation laws and regulations, the Secretary shall cooperate with the relevant departments and agencies of the Federal Government and of the affected States. In the formulation and promulgation of regulations, the Secretary shall request and give due consideration to the views of the Attorney General with respect to matters which may affect competition. In considering any regulations and in preparing any such views, the Attorney General shall consult with the Federal Trade Commission. The regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions--

(1) for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit (A) at the request of a lessee, in the national interest, to facilitate proper development of a lease or to allow for the construction or negotiation for use of transportation facilities, or (B) if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment, and for the extension of any permit or lease affected by suspension or prohibition under clause (A) or (B) by a period equivalent to the period of such suspension or prohibition, except that no permit or lease shall be so extended when such suspension or prohibition is the result of gross negligence or willful violation of such lease or permit, or of regulations issued with respect to such lease or permit;

A5

(2) with respect to cancellation of any lease or permit--

(A) that such cancellation may occur at any time, if the Secretary determines, after a hearing, that--

(i) continued activity pursuant to such lease or permit would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal, or human environment;

(ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and

(iii) the advantages of cancellation outweigh the advantages of continuing such lease or permit in force;

(B) that such cancellation shall not occur unless and until operations under such lease or permit shall have been under suspension, or temporary prohibition, by the Secretary, with due extension of any lease or permit term continuously for a period of five years, or for a lesser period upon request of the lessee;

(C) that such cancellation shall entitle the lessee to receive such compensation as he shows to the Secretary as being equal to the lesser of (i) the fair value of the canceled rights as of the date of cancellation, taking account of both anticipated revenues from the lease and anticipated costs, including costs of compliance with all applicable regulations and operating orders, liability for cleanup costs or damages, or both, in the case of an oilspill, and all other costs reasonably anticipated on the lease, or (ii) the excess, if any, over the lessee's revenues, from the lease (plus interest thereon from the date of receipt to date of reimbursement) of all consideration paid for the lease and all direct expenditures made by the lessee after the date of issuance of such lease and in connection with exploration or development, or both, pursuant to the lease (plus interest on such consideration and such expenditures from date of payment to date of reimbursement), except that (I) with respect to leases issued before September 18, 1978, such compensation shall be equal to the amount specified in clause (i) of this subparagraph; and (II) in the case of joint leases which are canceled due to the failure of one or more partners to exercise due diligence, the innocent parties shall have the right to seek damages for such loss from the responsible party or parties and the right to acquire the interests of the negligent party or parties and be issued the lease in

A6

question;

(3) for the assignment or relinquishment of a lease;

(4) for unitization, pooling, and drilling agreements;

(5) for the subsurface storage of oil and gas from any source other than by the Federal Government;

(6) for drilling or easements necessary for exploration, development, and production;

(7) for the prompt and efficient exploration and development of a lease area; and

(8) for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State.

(b) Compliance with regulations as condition for issuance, continuation, assignment, or other transfer of leases

The issuance and continuance in effect of any lease, or of any assignment or other transfer of any lease, under the provisions of this subchapter shall be conditioned upon compliance with regulations issued under this subchapter.

(c) Cancellation of nonproducing lease

Whenever the owner of a nonproducing lease fails to comply with any of the provisions of this subchapter, or of the lease, or of the regulations issued under this subchapter, such lease may be canceled by the Secretary, subject to the right of judicial review as provided in this subchapter, if such default continues for the period of thirty days after mailing of notice by registered letter to the lease owner at his record post office address.

(d) Cancellation of producing lease

Whenever the owner of any producing lease fails to comply with any of the provisions of

A7

this subchapter, of the lease, or of the regulations issued under this subchapter, such lease may be forfeited and canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of this subchapter.

(e) Pipeline rights-of-way; forfeiture of grant

Rights-of-way through the submerged lands of the outer Continental Shelf, whether or not such lands are included in a lease maintained or issued pursuant to this subchapter, may be granted by the Secretary for pipeline purposes for the transportation of oil, natural gas, sulphur, or other minerals, or under such regulations and upon such conditions as may be prescribed by the Secretary, or where appropriate the Secretary of Transportation, including (as provided in section 1347(b) of this title) assuring maximum environmental protection by utilization of the best available and safest technologies, including the safest practices for pipeline burial and upon the express condition that oil or gas pipelines shall transport or purchase without discrimination, oil or natural gas produced from submerged lands or outer Continental Shelf lands in the vicinity of the pipelines in such proportionate amounts as the Federal Energy Regulatory Commission, in consultation with the Secretary of Energy, may, after a full hearing with due notice thereof to the interested parties, determine to be reasonable, taking into account, among other things, conservation and the prevention of waste. Failure to comply with the provisions of this section or the regulations and conditions prescribed under this section shall be grounds for forfeiture of the grant in an appropriate judicial proceeding instituted by the United States in any United States district court having jurisdiction under the provisions of this subchapter.

(f) Competitive principles governing pipeline operation

(1) Except as provided in paragraph (2), every permit, license, easement, right-of-way, or other grant of authority for the transportation by pipeline on or across the outer Continental Shelf of oil or gas shall require that the pipeline be operated in accordance with the following competitive principles:

(A) The pipeline must provide open and nondiscriminatory access to both owner and nonowner shippers.

(B) Upon the specific request of one or more owner or nonowner shippers able to provide a guaranteed level of throughput, and on the condition that the shipper or shippers requesting such expansion shall be responsible for bearing their proportionate

A8

share of the costs and risks related thereto, the Federal Energy Regulatory Commission may, upon finding, after a full hearing with due notice thereof to the interested parties, that such expansion is within technological limits and economic feasibility, order a subsequent expansion of throughput capacity of any pipeline for which the permit, license, easement, right-of-way, or other grant of authority is approved or issued after September 18, 1978. This subparapraph1 shall not apply to any such grant of authority approved or issued for the Gulf of Mexico or the Santa Barbara Channel.

(2) The Federal Energy Regulatory Commission may, by order or regulation, exempt from any or all of the requirements of paragraph (1) of this subsection any pipeline or class of pipelines which feeds into a facility where oil and gas are first collected or a facility where oil and gas are first separated, dehydrated, or otherwise processed.

(3) The Secretary of Energy and the Federal Energy Regulatory Commission shall consult with and give due consideration to the views of the Attorney General on specific conditions to be included in any permit, license, easement, right-of-way, or grant of authority in order to ensure that pipelines are operated in accordance with the competitive principles set forth in paragraph (1) of this subsection. In preparing any such views, the Attorney General shall consult with the Federal Trade Commission.

(4) Nothing in this subsection shall be deemed to limit, abridge, or modify any authority of the United States under any other provision of law with respect to pipelines on or across the outer Continental Shelf.

(g) Rates of production

(1) The leasee2 shall produce any oil or gas, or both, obtained pursuant to an approved development and production plan, at rates consistent with any rule or order issued by the President in accordance with any provision of law.

(2) If no rule or order referred to in paragraph (1) has been issued, the lessee shall produce such oil or gas, or both, at rates consistent with any regulation promulgated by the Secretary of Energy which is to assure the maximum rate of production which may be sustained without loss of ultimate recovery of oil or gas, or both, under sound engineering and economic principles, and which is safe for the duration of the activity covered by the approved plan. The Secretary may permit the lessee to vary such rates if he finds that such variance is necessary.

A9

(h) Federal action affecting outer Continental Shelf; notification; recommended changes

The head of any Federal department or agency who takes any action which has a direct and significant effect on the outer Continental Shelf or its development shall promptly notify the Secretary of such action and the Secretary shall thereafter notify the Governor of any affected State and the Secretary may thereafter recommend such changes in such action as are considered appropriate.

(i) Flaring of natural gas

After September 18, 1978, no holder of any oil and gas lease issued or maintained pursuant to this subchapter shall be permitted to flare natural gas from any well unless the Secretary finds that there is no practicable way to complete production of such gas, or that such flaring is necessary to alleviate a temporary emergency situation or to conduct testing or work-over operations.

(j) Cooperative development of common hydrocarbon-bearing areas

(1) Findings

(A)3 The Congress of the United States finds that the unrestrained competitive production of hydrocarbons from a common hydrocarbon-bearing geological area underlying the Federal and State boundary may result in a number of harmful national effects, including--

(i) the drilling of unnecessary wells, the installation of unnecessary facilities and other imprudent operating practices that result in economic waste, environmental damage, and damage to life and property;

(ii) the physical waste of hydrocarbons and an unnecessary reduction in the amounts of hydrocarbons that can be produced from certain hydrocarbon-bearing areas; and

(iii) the loss of correlative rights which can result in the reduced value of national hydrocarbon resources and disorders in the leasing of Federal and State resources.

(2) Prevention of harmful effects

A10

The Secretary shall prevent, through the cooperative development of an area, the harmful effects of unrestrained competitive production of hydrocarbons from a common hydrocarbon-bearing area underlying the Federal and State boundary.

A11

## 43 U.S.C.A. § 1337

## § 1337. Leases, easements, and right-of-way on the outer Continental Shelf

## Effective: August 8, 2005

a) Oil and gas leases; award to highest responsible qualified bidder; method of bidding; royalty relief; Congressional consideration of bidding system; notice

(1) The Secretary is authorized to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas lease on submerged lands of the outer Continental Shelf which are not covered by leases meeting the requirements of subsection (a) of section 1335 of this title. Such regulations may provide for the deposit of cash bids in an interest-bearing account until the Secretary announces his decision on whether to accept the bids, with the interest earned thereon to be paid to the Treasury as to bids that are accepted and to the unsuccessful bidders as to bids that are rejected. The bidding shall be by sealed bid and, at the discretion of the Secretary, on the basis of--

(A) cash bonus bid with a royalty at not less than 12 ½ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold;

(B) variable royalty bid based on a per centum in amount or value of the production saved, removed, or sold, with either a fixed work commitment based on dollar amount for exploration or a fixed cash bonus as determined by the Secretary, or both;

(C) cash bonus bid, or work commitment bid based on a dollar amount for exploration with a fixed cash bonus, and a diminishing or sliding royalty based on such formulae as the Secretary shall determine as equitable to encourage continued production from the lease area as resources diminish, but not less than 12 ½ per centum at the beginning of the lease period in amount or value of the production saved, removed, or sold;

(D) cash bonus bid with a fixed share of the net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area;

(E) fixed cash bonus with the net profit share reserved as the bid variable;

A12

(F) cash bonus bid with a royalty at no less than 12 ½ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold and a fixed per centum share of net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area;

(G) work commitment bid based on a dollar amount for exploration with a fixed cash bonus and a fixed royalty in amount or value of the production saved, removed, or sold;

(H) cash bonus bid with royalty at no less than 12 and ½ per centum fixed by the Secretary in amount or value of production saved, removed, or sold, and with suspension of royalties for a period, volume, or value of production determined by the Secretary, which suspensions may vary based on the price of production from the lease; or

(I) subject to the requirements of paragraph (4) of this subsection, any modification of bidding systems authorized in subparagraphs (A) through (G), or any other systems of bid variables, terms, and conditions which the Secretary determines to be useful to accomplish the purposes and policies of this subchapter, except that no such bidding system or modification shall have more than one bid variable.

. . .

(b) Terms and provisions of oil and gas leases

An oil and gas lease issued pursuant to this section shall--

(1) be for a tract consisting of a compact area not exceeding five thousand seven hundred and sixty acres, as the Secretary may determine, unless the Secretary finds that a larger area is necessary to comprise a reasonable economic production unit;

(2) be for an initial period of--

(A) five years; or

(B) not to exceed ten years where the Secretary finds that such longer period is necessary to encourage exploration and development in areas because of unusually deep water or other unusually adverse conditions,

A13

and as long after such initial period as oil or gas is produced from the area in paying quantities, or drilling or well reworking operations as approved by the Secretary are conducted thereon;

(3) require the payment of amount or value as determined by one of the bidding systems set forth in subsection (a) of this section;

(4) entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area, conditioned upon due diligence requirements and the approval of the development and production plan required by this subchapter;

(5) provide for suspension or cancellation of the lease during the initial lease term or thereafter pursuant to section 1334 of this title;

(6) contain such rental and other provisions as the Secretary may prescribe at the time of offering the area for lease; and

(7) provide a requirement that the lessee offer 20 per centum of the crude oil, condensate, and natural gas liquids produced on such lease, at the market value and point of delivery applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973 [15 U.S.C.A. § 751 et seq.].

. . .

A14

## 43 U.S.C.A. § 1340

### § 1340. Geological and geophysical explorations

(a) Approved exploration plans

(1) Any agency of the United States and any person authorized by the Secretary may conduct geological and geophysical explorations in the outer Continental Shelf, which do not interfere with or endanger actual operations under any lease maintained or granted pursuant to this subchapter, and which are not unduly harmful to aquatic life in such area.

(2) The provisions of paragraph (1) of this subsection shall not apply to any person conducting explorations pursuant to an approved exploration plan on any area under lease to such person pursuant to the provisions of this subchapter.

(b) Oil and gas exploration

Except as provided in subsection (f) of this section, beginning ninety days after September 18, 1978, no exploration pursuant to any oil and gas lease issued or maintained under this subchapter may be undertaken by the holder of such lease, except in accordance with the provisions of this section.

(c) Plan approval; State concurrence; plan provisions

(1) Except as otherwise provided in this subchapter, prior to commencing exploration pursuant to any oil and gas lease issued or maintained under this subchapter, the holder thereof shall submit an exploration plan to the Secretary for approval. Such plan may apply to more than one lease held by a lessee in any one region of the outer Continental Shelf, or by a group of lessees acting under a unitization, pooling, or drilling agreement, and shall be approved by the Secretary if he finds that such plan is consistent with the provisions of this subchapter, regulations prescribed under this subchapter, including regulations prescribed by the Secretary pursuant to paragraph (8) of section 1334(a) of this title, and the provisions of such lease. The Secretary shall require such modifications of such plan as are necessary to achieve such consistency. The Secretary shall approve such plan, as submitted or modified, within thirty days of its submission, except that the Secretary shall disapprove such plan if he determines that (A) any proposed activity under such plan would result in any condition described in section 1334(a)(2)(A)(i) of this title, and (B) such proposed activity cannot be modified to avoid such condition. If the Secretary disapproves a plan under the preceding sentence, he may, subject to section 1334(a)(2)(B) of this title, cancel such lease and the lessee shall be entitled to compensation in accordance with the regulations prescribed under section 1334(a)(2)(C)(i) or (ii) of this title.

A15

(2) The Secretary shall not grant any license or permit for any activity described in detail in an exploration plan and affecting any land use or water use in the coastal zone of a State with a coastal zone management program approved pursuant to section 1455 of Title 16, unless the State concurs or is conclusively presumed to concur with the consistency certification accompanying such plan pursuant to section 1456(c)(3)(B)(i) or (ii) of Title 16, or the Secretary of Commerce makes the finding authorized by section 1456(c)(3)(B)(iii) of Title 16.

(3) An exploration plan submitted under this subsection shall include, in the degree of detail which the Secretary may by regulation require--

  (A) a schedule of anticipated exploration activities to be understaken1;

  (B) a description of equipment to be used for such activities;

  (C) the general location of each well to be drilled; and

  (D) such other information deemed pertinent by the Secretary.

(4) The Secretary may, by regulation, require that such plan be accompanied by a general statement of development and production intentions which shall be for planning purposes only and which shall not be binding on any party.

(d) Drilling permit

The Secretary may, by regulation, require any lessee operating under an approved exploration plan to obtain a permit prior to drilling any well in accordance with such plan.

(e) Plan revisions; conduct of exploration activities

(1) If a significant revision of an exploration plan approved under this subsection is submitted to the Secretary, the process to be used for the approval of such revision shall be the same as set forth in subsection (c) of this section.

(2) All exploration activities pursuant to any lease shall be conducted in accordance with an approved exploration plan or an approved revision of such plan.

A16

(f) Drilling permits issued and exploration plans approved within 90-day period after September 18, 1978

(1) Exploration activities pursuant to any lease for which a drilling permit has been issued or for which an exploration plan has been approved, prior to ninety days after September 18, 1978, shall be considered in compliance with this section, except that the Secretary may, in accordance with section 1334(a)(1)(B) of this title, order a suspension or temporary prohibition of any exploration activities and require a revised exploration plan.

(2) The Secretary may require the holder of a lease described in paragraph (1) of this subsection to supply a general statement in accordance with subsection (c)(4) of this section, or to submit other information.

(3) Nothing in this subsection shall be construed to amend the terms of any permit or plan to which this subsection applies.

(g) Determinations requisite to issuance of permits

Any permit for geological explorations authorized by this section shall be issued only if the Secretary determines, in accordance with regulations issued by the Secretary, that--

   (1) the applicant for such permit is qualified;

   (2) the exploration will not interfere with or endanger operations under any lease issued or maintained pursuant to this subchapter; and

   (3) such exploration will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance.

. . .

A17

## 43 U.S.C.A. § 1344

### § 1344. Outer Continental Shelf leasing program

(a) Schedule of proposed oil and gas lease sales

The Secretary, pursuant to procedures set forth in subsections (c) and (d) of this section, shall prepare and periodically revise, and maintain an oil and gas leasing program to implement the policies of this subchapter. The leasing program shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval. Such leasing program shall be prepared and maintained in a manner consistent with the following principles:

(1) Management of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments.

(2) Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer Continental Shelf shall be based on a consideration of--

(A) existing information concerning the geographical, geological, and ecological characteristics of such regions;

(B) an equitable sharing of developmental benefits and environmental risks among the various regions;

(C) the location of such regions with respect to, and the relative needs of, regional and national energy markets;

(D) the location of such regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the outer Continental Shelf;

A18

(E) the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination;

(F) laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration;

(G) the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf; and

(H) relevant environmental and predictive information for different areas of the outer Continental Shelf.

(3) The Secretary shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

(4) Leasing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government.

. . .

A19

## 43 U.S.C.A. § 1351

### § 1351. Oil and gas development and production

(a) Development and production plans; submission to Secretary; statement of facilities and operation; submission to Governors of affected States and local governments

(1) Prior to development and production pursuant to an oil and gas lease issued after September 18, 1978, in any area of the outer Continental Shelf, other than the Gulf of Mexico, or issued or maintained prior to September 18, 1978, in any area of the outer Continental Shelf, other than the Gulf of Mexico, with respect to which no oil or gas has been discovered in paying quantities prior to September 18, 1978, the lessee shall submit a development and production plan (hereinafter in this section referred to as a "plan") to the Secretary, for approval pursuant to this section.

(2) A plan shall be accompanied by a statement describing all facilities and operations, other than those on the outer Continental Shelf, proposed by the lessee and known by him (whether or not owned or operated by such lessee) which will be constructed or utilized in the development and production of oil or gas from the lease area, including the location and site of such facilities and operations, the land, labor, material, and energy requirements associated with such facilities and operations, and all environmental and safety safeguards to be implemented.

(3) Except for any privileged or proprietary information (as such term is defined in regulations issued by the Secretary), the Secretary, within ten days after receipt of a plan and statement, shall (A) submit such plan and statement to the Governor of any affected State, and, upon request to the executive of any affected local government, and (B) make such plan and statement available to any appropriate interstate regional entity and the public.

(b) Development and production activities in accordance with plan as lease requirement

After September 18, 1978, no oil and gas lease may be issued pursuant to this subchapter in any region of the outer Continental Shelf, other than the Gulf of Mexico, unless such lease requires that development and production activities be carried out in accordance with a plan which complies with the requirements of this section.

A20

(c) Scope and contents of plan

A plan may apply to more than one oil and gas lease, and shall set forth, in the degree of detail established by regulations issued by the Secretary--

(1) the specific work to be performed;

(2) a description of all facilities and operations located on the outer Continental Shelf which are proposed by the lessee or known by him (whether or not owned or operated by such lessee) to be directly related to the proposed development, including the location and size of such facilities and operations, and the land, labor, material, and energy requirements associated with such facilities and operations;

(3) the environmental safeguards to be implemented on the outer Continental Shelf and how such safeguards are to be implemented;

(4) all safety standards to be met and how such standards are to be met;

(5) an expected rate of development and production and a time schedule for performance; and

(6) such other relevant information as the Secretary may by regulation require.

(d) State concurrence in land or water zone use in coastal zone of State

The Secretary shall not grant any license or permit for any activity described in detail in a plan and affecting any land use or water use in the coastal zone of a State with a coastal zone management program approved pursuant to section 306 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1455), unless the State concurs or is conclusively presumed to concur with the consistency certification accompanying such plan pursuant to section 307(c)(3)(B)(i) or (ii) of such Act [16 U.S.C.A. § 1456(c)(3)(B)(i) or (ii)], or the Secretary of Commerce makes the finding authorized by section 307(c)(3)(B)(iii) of such Act [16 U.S.C.A. § 1456(c)(3)(B)(iii)].

(e) Declaration of approval of development and production plan as major Federal action; submission of preliminary or final lease plans prior to commencement of National

A21

Environmental Policy provisions procedures

(1) At least once the Secretary shall declare the approval of a development and production plan in any area or region (as defined by the Secretary) of the outer Continental Shelf, other than the Gulf of Mexico, to be a major Federal action.

(2) The Secretary may require lessees of tracts for which development and production plans have not been approved, to submit preliminary or final plans for their leases, prior to or immediately after a determination by the Secretary that the procedures under the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] shall commence.

(f) Plans considered major Federal actions; submission of draft environmental impact statement to Governors of affected States and local governments

If approval of a development and production plan is found to be a major Federal action, the Secretary shall transmit the draft environmental impact statement to the Governor of any affected State, and upon request, to the executive of any local government, and shall make such draft available to any appropriate interstate regional entity and the public.

(g) Plans considered nonmajor Federal actions; comments and recommendations from States

If approval of a development and production plan is not found to be a major Federal action, the Governor of any affected State and the executive of any affected local government shall have sixty days from the date of receipt of the plan from the Secretary to submit comments and recommendations. Prior to submitting recommendations to the Secretary, the executive of any affected local government must forward his recommendations to the Governor of his State. Such comments and recommendations shall be made available to the public upon request. In addition, any interested person may submit comments and recommendations.

(h) Approval, disapproval or modification of plan; reapplication; periodic review

(1) After reviewing the record of any public hearing held with respect to the approval of a plan pursuant to the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] or the comments and recommendations submitted under subsection (g) of this

A22

section, the Secretary shall, within sixty days after the release of the final environmental impact statement prepared pursuant to the National Environmental Policy Act of 1969 in accordance with subsection (e) of this section, or sixty days after the period provided for comment under subsection (g) of this section, approve, disapprove, or require modifications of the plan. The Secretary shall require modification of a plan if he determines that the lessee has failed to make adequate provision in such plan for safe operations on the lease area or for protection of the human, marine, or coastal environment, including compliance with the regulations prescribed by the Secretary pursuant to paragraph (8) of section 1334(a) of this title. Any modification required by the Secretary which involves activities for which a Federal license or permit is required and which affects any land use or water use in the coastal zone of a State with a coastal zone management program approved pursuant to section 306 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1455) must receive concurrence by such State with respect to the consistency certification accompanying such plan pursuant to section 307(c)(3)(B)(i) or (ii) of such Act [16 U.S.C.A. § 1456(c)(3)(B)(i) or (ii)] unless the Secretary of Commerce makes the finding authorized by section 307(c)(3)(B)(iii) of such Act [16 U.S.C.A. § 1456(c)(3)(B)(iii)]. The Secretary shall disapprove a plan--

(A) if the lessee fails to demonstrate that he can comply with the requirements of this subchapter or other applicable Federal law, including the regulations prescribed by the Secretary pursuant to paragraph (8) of section 1334(a) of this title;

(B) if any of the activities described in detail in the plan for which a Federal license or permit is required and which affects any land use or water use in the coastal zone of a State with a coastal zone management program approved pursuant to section 306 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1455) do not receive concurrence by such State with respect to the consistency certification accompanying such plan pursuant to section 307(c)(3)(B)(i) or (ii) of such Act [16 U.S.C.A. § 1456(c)(3)(B)(i) or (ii)] and the Secretary of Commerce does not make the finding authorized by section 307(c)(3)(B)(iii) of such Act [16 U.S.C.A. § 1456(c)(3)(B)(iii)];

(C) if operations threaten national security or national defense; or

(D) if the Secretary determines, because of exceptional geological conditions in the lease areas, exceptional resource values in the marine or coastal environment, or other exceptional circumstances, that (i) implementation of the plan would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), to the national security or defense, or to the marine, coastal or human environments, (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time, and

(iii) the advantages of disapproving the plan outweigh the advantages of development and production.

(2)(A) If a plan is disapproved--

(i) under subparagraph (A) of paragraph (1); or

(ii) under subparagraph (B) of paragraph (1) with respect to a lease issued after approval of a coastal zone management program pursuant to the Coastal Zone Management Act of 1972 (16 U.S.C. 1455),

the lessee shall not be entitled to compensation because of such disapproval.

(B) If a plan is disapproved--

(i) under subparagraph (C) or (D) of paragraph (1); or

(ii) under subparagraph (B) of paragraph (1) with respect to a lease issued before approval of a coastal zone management program pursuant to the Coastal Zone Management Act of 1972 [16 U.S.C.A. § 1451 et seq.], and such approval occurs after the lessee has submitted a plan to the Secretary,

the term of the lease shall be duly extended, and at any time within five years after such disapproval, the lessee may reapply for approval of the same or a modified plan, and the Secretary shall approve, disapprove, or require modifications of such plan in accordance with this subsection.

(C) Upon expiration of the five-year period described in subparagraph (B) of this paragraph, or, in the Secretary's discretion, at an earlier time upon request of a lessee, if the Secretary has not approved a plan, the Secretary shall cancel the lease and the lessee shall be entitled to receive compensation in accordance with section 1334(a)(2)(C) of this title. The Secretary may, at any time within the five-year period described in subparagraph (B) of this paragraph, require the lessee to submit a development and production plan for approval, disapproval, or modification. If the lessee fails to submit a required plan expeditiously and in good faith, the Secretary shall find that the lessee has not been duly diligent in pursuing his obligations under the lease, and shall immediately initiate procedures to cancel such lease, without compensation, under the provisions of

A24

section 1334(c) of this title.

(3) The Secretary shall, from time to time, review each plan approved under this section. Such review shall be based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and production pursuant to such plan. If the review indicates that the plan should be revised to meet the requirements of this subsection, the Secretary shall require such revision.

(i) Approval of revision of approved plan

The Secretary may approve any revision of an approved plan proposed by the lessee if he determines that such revision will lead to greater recovery of oil and natural gas, improve the efficiency, safety, and environmental protection of the recovery operation, is the only means available to avoid substantial economic hardship to the lessee, or is otherwise not inconsistent with the provisions of this subchapter, to the extent such revision is consistent with protection of the human, marine, and coastal environments. Any revision of an approved plan which the Secretary determines is significant shall be reviewed in accordance with subsections (d) through (f) of this section.

(j) Cancellation of lease on failure to submit plan or comply with approved plan

Whenever the owner of any lease fails to submit a plan in accordance with regulations issued under this section, or fails to comply with an approved plan, the lease may be canceled in accordance with section 1334(c) and (d) of this title. Termination of a lease because of failure to comply with an approved plan, including required modifications or revisions, shall not entitle a lessee to any compensation.

(k) Production and transportation of natural gas; submission of plan to Federal Energy Regulatory Commission; impact statement

If any development and production plan submitted to the Secretary pursuant to this section provides for the production and transportation of natural gas, the lessee shall contemporaneously submit to the Federal Energy Regulatory Commission that portion of such plan which relates to production of natural gas and the facilities for transportation of natural gas. The Secretary and the Federal Energy Regulatory Commission shall agree as to which of them shall prepare an environmental impact statement pursuant to the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] applicable to such portion of such plan, or conduct studies as to the effect on the environment of

A25

implementing it. Thereafter, the findings and recommendations by the agency preparing such environmental impact statement or conducting such studies pursuant to such agreement shall be adopted by the other agency, and such other agency shall not independently prepare another environmental impact statement or duplicate such studies with respect to such portion of such plan, but the Federal Energy Regulatory Commission, in connection with its review of an application for a certificate of public convenience and necessity applicable to such transportation facilities pursuant to section 717f of Title 15, may prepare such environmental studies or statement relevant to certification of such transportation facilities as have not been covered by an environmental impact statement or studies prepared by the Secretary. The Secretary, in consultation with the Federal Energy Regulatory Commission, shall promulgate rules to implement this subsection, but the Federal Energy Regulatory Commission shall retain sole authority with respect to rules and procedures applicable to the filing of any application with the Commission and to all aspects of the Commission's review of, and action on, any such application.

(l) Application of provisions to leases in Gulf of Mexico

The Secretary may require the provisions of this section to apply to an oil and gas lease issued or maintained under this subchapter, which is located in that area of the Gulf of Mexico which is adjacent to the State of Florida, as determined pursuant to section 1333(a)(2) of this title.

A26

**40 C.F.R. § 1500.3**

**§ 1500.3 Mandate.**

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub.L. 91–190, 42 U.S.C. 4321 et seq.) (NEPA or the Act) except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.) section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to sec. 102(2)(C)(environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

# 40 C.F.R. § 1502.1

## § 1502.1 Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

**40 C.F.R. § 1502.2**

**§ 1502.2 Implementation.**

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

. . .

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

A29

## 40 C.F.R. § 1502.14

## § 1502.14 Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

## 40 C.F.R. § 1502.22

### § 1502.22 Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

A31

**Federal Rules of Appellate Procedure Rule 4, 28 U.S.C.A.**

**Rule 4. Appeal as of Right--When Taken**

(a) Appeal in a Civil Case.

 (1) Time for Filing a Notice of Appeal.

  . . .

  (B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

   (i) the United States;

   (ii) a United States agency;

   (iii) a United States officer or employee sued in an official capacity; or

   (iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf--including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

  . . .

A32