IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12-35287

NATIVE VILLAGE OF POINT HOPE, INUPIAT COMMUNITY OF THE
ARCTIC SLOPE, ALASKA WILDERNESS LEAGUE, CENTER FOR
BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, NATIONAL
AUDUBON SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL,
NORTHERN ALASKA ENVIRONMENTAL CENTER, OCEANA, PACIFIC
ENVIRONMENT, RESISTING DESTRUCTION ON INDIGENOUS LANDS
(REDOIL), SIERRA CLUB, THE WILDERNESS SOCIETY, and
WORLD WILDLIFE FUND,

Plaintiffs-Appellants,

v.

KEN SALAZAR, Secretary of the Interior, TOMMY BEAUDREAU,
Director of Bureau of Ocean Energy Management; and
BUREAU OF OCEAN ENERGY MANAGEMENT,

Defendants-Appellees,

SHELL GULF OF MEXICO INC., CONOCOPHILLIPS COMPANY, STATE OF
ALASKA, and STATOIL USA E&P, INC.,

Intervenor Defendants-Appellees

On Appeal from the United States District Court for the District of Alaska

**ANSWER BRIEF OF DEFENDANTS-APPELLEES**

OF COUNSEL:

SUSAN CASON
 Attorney-Adviser
 Office of the Solicitor
 U.S. Department of the Interior
 1849 C Street NW
 Washington, D.C.  20240

IGNACIA S. MORENO
Assistant Attorney General

JOHN E. ARBAB
DAVID C. SHILTON
 Attorneys, United States Department of Justice
 Environment & Natural Resources Division
 P.O. Box 7415
 Washington, D.C.  20044
 (202) 514-5580

**TABLE OF CONTENTS**

**Page**

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     Statutory and Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . 2

         1.     The OCSLA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

         2.     National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . 5

     B.     Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

         1.     The 2007 Lease Sale 193 EIS . . . . . . . . . . . . . . . . . . . . . . . 7

         2.     Plaintiffs' Challenge to Lease Sale 193 . . . . . . . . . . . . . . . . . 9

         3.     The Supplemental EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     I.     BOEM'S DETERMINATION THAT IT WAS NOT ESSENTIAL
             TO OBTAIN MISSING INFORMATION AT THE
             LEASE SALE STAGE WAS NOT ARBITRARY OR
             CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         A.     It was not Arbitrary or Capricious for BOEM to Find that
               Incomplete Information Regarding the Distribution and
               Habitat of Species Was Not Essential . . . . . . . . . . . . . . . . . 20

B.    It Was Not Arbitrary or Capricious for BOEM to Rely on Thematic Responses to Explain Why Missing Information Was Not Essential . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.    BOEM's Findings of Sufficient Information Were Logical and Supported by the Record . . . . . . . . . . . . . . . . . . . . 31

2.    Reliance on the OCSLA Staged Process Was Appropriate 32

3.    BOEM Properly Considered Other Statutory Protections  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

4.    Additional Analysis of Oil Spill Impacts Was Not Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

5.    BOEM Properly Responded to the USGS Report . . . . 38

II.    IT WAS NOT ARBITRARY OR CAPRICIOUS FOR BOEM TO USE A ONE BILLION BARREL DEVELOPMENT SCENARIO FOR ANALYSIS OF POSSIBLE IMPACTS SHOULD DEVELOPMENT OCCUR AT ALL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

III.    VACATING THE LEASES OR OTHER INJUNCTIVE RELIEF WOULD NOT BE AN APPROPRIATE REMEDY FOR ANY NEPA VIOLATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## TABLE OF AUTHORITIES

<u>**Cases:**</u>

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 431 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49,50

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*,
462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*California Communities Against Toxics v. U.S. E.P.A.*,
F.3d , 2012 WL 3038520, *3 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . 47

*Center for Biological Diversity v. Salazar*,
F.3d , 2012 WL 3570667 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 50

*Colorado Environmental Coalition v. Dombeck*,
185 F.3d 1162 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*County of Suffolk v. Secretary of the Interior*,
562 F.2d 1368 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Edwardsen v. U.S. Dep't of Interior*,
268 F.3d 781 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,38

*Greenwood v. F.A.A.*,
28 F.3d 971 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Guatay Christian Fellowship v. County of San Diego*,
670 F.3d 957 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Habitat Educ. Center, Inc. v. U.S. Forest Service*,
673 F.3d 518 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Inupiat Community of the Arctic Slope v. Salazar*,
2012 WL 1929971 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir.2008) (en banc) . . . . . . . . . . . . . . . . . 14,17,26,28,46

*League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest*
    *Service*, 549 F.3d 1211 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Muckleshoot Indian Tribe v. United States Forest Serv.,*
    177 F.3d 800 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,34

*Native Ecosystems Council v. U.S. Forest Service,*
    418 F.3d 953 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Native Village of Point Hope v. Salazar,*
    680 F.3d 1123 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,49

*N. Alaska Envtl. Ctr. v. Kempthorne,*
    457 F.3d 969 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 13,14,18,19,37

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
    668 F.3d 1067 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*North Slope Borough v. Andrus,*
    642 F.2d 589 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33,35

*Okanogan Highlands Alliance v. Williams,*
    236 F.3d 468 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Pac. Rivers Council v. U.S. Forest Serv.,*
    F.3d   , 2012 WL 2333558 at *16-17 (9th Cir. 2012) . . . . . . . . . . . . . 35

*People of Village of Gambell v. Clark,*
    746 F.2d 572 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,44

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
    588 F.3d 718 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

iv

*S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*,
    720 F.2d 1475 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Salmon River Concerned Citizens v. Robertson*,
    32 F.3d 1346 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Save the Yaak Comm. v. Block*,
    840 F.2d 714 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sec'y of Interior v. California*,
    464 U.S. 312 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,32

*Sierra Club v. Morton*,
    510 F.2d 813 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Southeast Alaska Conservation Council v. Federal Highway Admin.*,
    649 F.3d 1050 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Tribal Village of Akutan v. Hodel*,
    869 F. 2d 1185 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Village of False Pass v. Clark*,
    733 F.2d 605 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Village of False Pass v. Watt*,
    565 F.Supp. 1161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## STATUTES:

Administrative Procedure Act
    5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Endangered Species Act
    16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    16 U.S.C. § 1536(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Magnuson-Stevens Fishery Conservation and Management Act
    16 U.S.C. § 1801 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Marine Mammal Protection Act
    16 U.S.C. § 1361 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
    16 U .S.C. § 1371(a)(5)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

National Environmental Policy Act
    42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
    42 U.S.C. § 4331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
    42 U.S.C. § 4332(2)(C)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
    42 U.S.C. § 7609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12,29,31

Outer Continental Shelf Lands Act
    43 U.S.C. § 1332(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3,48
    43 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,3
    43 U.S.C. § 1337 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,3
    43 U.S.C. § 1337(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    43 U.S.C. § 1340(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4,26,49
    43 U.S.C. § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    43 U.S.C. § 1351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4,26
    43 U.S.C. § 1351(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

## RULES and REGULATIONS:

30 C.F.R. § 550.207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

30 C.F.R. § 550.211–.228 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

30 C.F.R. § 550.241-.262 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

30 C.F.R. § 550.269 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

40 C.F.R. § 1501.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

40 C.F.R. § 1502.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

40 C.F.R. § 1502.22(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

40 C.F.R. § 1502.22(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

vi

40 C.F.R. § 1507.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

40 C.F.R. §1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

40 C.F.R. §1508.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 C.F.R. § 402.04(a)(2) (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

50 C.F.R. § 402.04(h) (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

51 Fed. Reg. 15,618 (Apr. 25, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

70 Fed. Reg. 54406 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

76 Fed. Reg. 64,432 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 95-590, 95th Cong., 2d Sess., *reprinted in*
       1978 U.S.C.C.A.N. 1450 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS:**

DOI Secretarial Order No. 3299, sec. 8 (May 19, 2010) . . . . . . . . . . . . . . . . . . . . . 1

## JURISDICTION

Defendants-appellees agree with the statement of jurisdiction in the opening

brief ("Br.") of plaintiffs-appellants Native Village of Point Hope, et al. at 4.

## STATEMENT OF ISSUES

This case involves the Secretary of the Interior's decision to conduct Outer

Continental Shelf ("OCS") oil and gas Lease Sale 193 and issue leases consistent

with the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§1334, 1337.

The Secretary relied on an environmental impact statement ("EIS") prepared

pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§4332(2)(C).  After the district court found two deficiencies in the EIS and

remanded to the agency, the Bureau of Ocean Energy Management (BOEM)[1]

prepared a supplemental EIS ("SEIS") to remedy those problems, and reaffirmed

---

[1] Lease Sale 193 was held in 2008, at a time when the Secretary of the Interior had delegated authority over leasing under the OCSLA to the former Minerals Management Service ("MMS").  In May 2010, the Secretary separated and reassigned the responsibilities of the former MMS to three separate divisions: the Bureau of Ocean Energy Management (BOEM), the Bureau of Safety and Environmental Enforcement, and the Office of Natural Resources Revenue.  DOI Secretarial Order No. 3299, sec. 8 (May 19, 2010).  The Secretary made BOEM responsible for managing the development of offshore resources, including leasing under the OCSLA and conducting appropriate environmental analyses under NEPA. *See* 76 Fed. Reg. 64,432 (2011); *see also  Native Village of Point Hope v. Salazar,* 680 F.3d 1123, 1128 (9th Cir. 2012) (discussing this reassignment). For simplicity, we will use the agency's current name ("BOEM") when referring to events at issue in this case.

the decision to hold the lease sale.  Plaintiffs' renewed challenge was dismissed. The issues presented in this appeal are:

1.   Whether the district court correctly upheld BOEM's determinations in the SEIS that missing or unavailable information regarding species and habitat in the Chukchi Sea was not "essential" at the lease sale stage for making a reasoned choice among alternatives, in compliance with Council on Environmental Quality's regulations governing treatment of incomplete or unavailable information in an EIS, 40 C.F.R. §1502.22.

2. Whether the EIS for this lease sale complied with NEPA by basing its analysis of impacts from possible oil production and development on a scenario that involved a one billion barrel field.

## STATEMENT OF THE CASE

### Nature of the Case.

#### A.    Statutory and Regulatory Background

#### 1.  The OCSLA.

The OCSLA was enacted in 1953 to establish a regime for offshore oil and gas leasing and was amended in 1978 with the goal of reducing the United States' dependence on foreign oil.  *See* H.R. Rep. No. 95-590, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 1450, 1460, 1464.  The 1978 amendments

established a national policy of making the OCS "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3).

The OCSLA prescribes a multi-stage process for development of offshore leases, with environmental review at each stage. This multi-stage process provides a "continuing opportunity for making informed adjustments" that ensures that OCS oil and gas activities are conducted in an environmentally sound manner. *Tribal Village of Akutan v. Hodel*, 869 F. 2d 1185, 1188 (9th Cir. 1988) ("*Village of Akutan*") (citations omitted). The first stage is the "five-year program," involving the development and publication of schedules of proposed OCS lease sales over a five-year period to best meet the nation's energy needs, 43 U.S.C. §1344. The second stage, at issue in this case, is the lease sale itself. *See generally* 43 U.S.C. §§1334, 1337. The decisions made at this stage include whether to have a sale, which lease blocks to offer in a sale, and whether to impose restrictions on the leases offered. The sale itself is accomplished through a competitive sealed-bid auction. 43 U.S.C. §1337(a)(1). The highest qualified bidders obtain leases which entitle them to conduct limited preliminary activities such as geophysical surveys. *See* 30 C.F.R. §550.207.

The third stage of the OCSLA process is the filing and review of an exploration plan pursuant to 43 U.S.C. §1340(c). The fourth and final stage, which is contingent upon discovery of a commercially feasible deposit of oil or gas, is the filing and review of a development and production plan. 43 U.S.C. §1351.

BOEM performs a programmatic analysis under NEPA for the five-year program and additional NEPA analysis at the lease sale stage. *See Village of False Pass v. Clark*, 733 F.2d 605, 608, 614 (9th Cir. 1984) ("*Village of False Pass*"). Both programmatic and lease sale EISs provide NEPA analysis for the broad decisions made at those stages and also provide a framework for tiering NEPA analyses conducted for subsequent lease exploration and development. *See* 40 C.F.R. §1508.28 (NEPA regulations on tiering of analyses). While the NEPA review at the exploration and development stages will tier to NEPA documents from earlier stages, both those stages require extensive, site-specific supporting environmental information for compliance with OCSLA as well as NEPA, the Endangered Species Act ("ESA"), and other environmental statutes. *See* 43 U.S.C. §§1340(c), 1351(c); 30 C.F.R. §§550.211–.228, .241– .262, .269; *see also Village of False Pass*, 733 F.2d at 608, 614.

4

### 3. The National Environmental Policy Act.

NEPA is essentially a procedural statute enacted to ensure that the federal government makes major decisions potentially affecting the environment only after considering the environmental impacts of those decisions and exploring possible alternatives to proposed actions. 42 U.S.C. §§4321, 4331; 40 C.F.R. §1501.1. Its primary purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions in advance of a final decision to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). Although NEPA establishes procedures by which agencies must consider the environmental impacts of their proposed actions, it does not dictate the substantive results of agency decision making. *Robertson*, 490 U.S. at 350; *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000) ("NEPA does not mandate particular substantive results, but instead imposes only procedural requirements") (quotations and citation omitted).

The form and content of a NEPA analysis is guided by the statute's implementing regulations, promulgated by the Council on Environmental Quality ("CEQ"). Under 40 C.F.R. §1502.22, when an agency evaluates reasonably foreseeable significant adverse effects in an EIS and there is incomplete or unavailable information, the agency must make clear that such information is

5

lacking. If that incomplete information "is essential to a reasoned choice among alternatives," the agency must include the information in the EIS if "the overall costs of obtaining it are not exorbitant"; however, if the cost of obtaining the information is exorbitant or the means of obtaining it not known, then the agency may instead include in the EIS an evaluation based on theoretical approaches or research methods generally accepted in the scientific community. 40 C.F.R. §1502.22(b).

### B. Factual Background.

BOEM began planning in 2002 for a potential Chukchi Sea lease sale during the Secretary's 2002–2007 five year program. Prior Chukchi Sea lease sales held in 1988 and 1991 had resulted in the issuance of 483 federal leases. Out of those 483 leases, only five exploration wells were ever drilled and there was no oil or gas development. EIS at V-9-10, SER406-07.[2] BOEM issued annual calls starting in 2003 to determine whether the oil and gas industry was interested in leases on the OCS in the Chukchi Sea, but it was not until 2005 that the industry expressed interest. *Id*. at ES-1, SER284. Because industry expressed interest in a larger area than originally expected, BOEM determined that a full EIS should be completed

---

[2] In this brief we will cite to plaintiff-appellants' Excerpts of Record ("ER") where possible. Other citations will be to appellees' joint Supplemental Excerpts of Record ("SER").

and deferred the potential sale until later when the 2007–2012 five-year program would be in effect. *Id.*

### 1. The 2007 Lease Sale 193 EIS.

In September 2005, BOEM began the pre-sale process for the deferred Lease Sale 193 with a Notice of Intent to prepare an EIS for the sale. 70 Fed. Reg. 54,406 (2005). The resulting multi-year public environmental analysis focused on potential leasing alternatives in the Chukchi Sea Planning Area, and resulted in the issuance in May 2007 of a three-volume, 1,700-page EIS. Contemporaneously, the National Marine Fisheries Service ("NMFS") and the U.S. Fish and Wildlife Service ("FWS") each issued lengthy Biological Opinions pursuant to the ESA, 16 U.S.C. §1536(b), concluding on the basis of the best available scientific and commercial data and information that the proposed Chukchi Sea lease sale was not likely to jeopardize any threatened or endangered species, or adversely modify any associated critical habitat. *See* EIS at VI-7, SER408.

The Lease Sale 193 EIS contained extensive baseline information on species found in the Chukchi Sea area, as well as on their habitat. *See* EIS at III-27-92, SER336-401; see also ER 30 (district court describes EIS). The EIS thoroughly considered the environmental consequences of possible exploration for and production and development of oil on the leases, even though there will be further

7

opportunities for NEPA compliance before any such exploration or development can go forward. See EIS at ES-4-7 (SER287-90).

To analyze possible impacts from production, BOEM developed a scenario based on "the petroleum-resource potential of the area, the technology to explore and produce oil and gas from the offshore area, and industry trends in northern Alaska." ER856. While BOEM found that the probability of any commercial development and production was less than 10% (ER859), BOEM nevertheless assumed for purposes of its NEPA analysis, "the discovery, development, and production of the first offshore project" which would likely be "a relatively large project that supports the cost of initial infrastructure." ER857. BOEM found that such a field would have to be in the one billion barrel range to warrant the very large infrastructure costs that would be required for development. ER858.

While the EIS contained extensive scientific information regarding the Chukchi Sea area and its resources, it acknowledged the existence of gaps in this data base, as would be expected for a remote region like the Chukchi Sea. However, the EIS did not expressly analyze whether filling these data gaps was "essential" in terms of the CEQ regulations on missing and unknown information, 40 C.F.R. §1502.22. ER24.

8

## 2. Plaintiffs' Challenge to Lease Sale 193.

In January 2008, the MMS issued a Final Notice of Sale for Lease Sale 193 to be conducted in February 2008. On January 31, 2008, the plaintiffs filed this suit in the district court alleging violations of NEPA and the Endangered Species Act. Plaintiffs did not seek to preliminarily enjoin the lease sale, and it went forward on February 6, 2008. ER131. After a review of bid adequacy, MMS issued 487 leases covering approximately 2.8 million acres. Monies collected from the high bids totaled approximately $2.6 billion and were deposited in the Treasury. ER211.

BOEM filed the administrative record and the parties filed motions for summary judgment. On July 21, 2010, the district court issued an Order Remanding to Agency. ER28-48. The court amended this order on August 5, 2010, making minor clarifications. ER7-27. While the court rejected claims that the EIS failed to take a hard look at the effects of seismic surveying (ER19-20), and failed to utilize a reasonable scenario for eventual oil development (ER21), it ruled that the EIS failed to analyze the environmental impact of natural gas development and failed to make the particular determinations called for by 40 C.F.R. §1502.22 when relevant information is incomplete or unavailable. ER21, 24, 26. The court found that these deficiencies would not "necessarily require the agency to completely redo the permitting process," but stated the agency would be required to address these

9

concerns.  ER26. Nor did the remand order "preclude BOEM from issuing permits under its permitting authorities * * * or prohibit routine paper transactions relating to Lease Sale 193."  ER27.

### 3.  The Supplemental EIS.

On remand, BOEM engaged in an additional 13-month public process that culminated in a 1,357-page supplemental EIS ("SEIS") that addressed the district court's concerns, as well as concerns raised in public comments regarding a possible very large oil spill in light of the Deepwater Horizon spill in the Gulf of Mexico.  ER131.  In a 98-page Appendix entitled "Analysis of Incomplete or Missing Information" (ER211-308), BOEM catalogued all information identified in the EIS as missing or incomplete, and followed a detailed written methodology that subjected each identified instance of incomplete or unavailable information to "an objective, sequential, and robust review process developed to ensure consistency with 40 CFR §1502.22."  SEIS ES-12 (SER15).  BOEM thoroughly documented and explained its methodology for this analysis (ER211-14) and responded to comments in a lengthy compendium of comments and responses.  *See* SER58-195.

In summarizing the methodology used for Appendix A, BOEM explained that it first determined whether particular missing information was "'relevant to reasonably foreseeable significant adverse effects on the human environment.'"

10

ER212. If so, BOEM considered whether the missing relevant information was "'essential to a reasoned choice among alternatives.'" *Id.* Several "common themes" became apparent during this phase of the analysis. Many of the identified data gaps could not be characterized as "essential" information because the existing scientific data made it possible to formulate and support sound scientific judgments without those particular pieces of information. ER213. Other missing information was not of the type that would alter scientific judgments or affect decision-making. *Id.* It was not essential to fill other gaps in information about the impacts of future oil development because it was possible to assess such impacts by making conservative assumptions, such as that oil spill impacts would actually occur. *Id.* Other information gaps about possible impacts were not essential to fill because the agency could make reasonable assumptions that they would be avoided due to the protective provisions of environmental laws and regulations. *Id.* BOEM also found that it was not essential to fill various information gaps because leasing is only the second stage in the four-stage OCSLA process, and there will be additional opportunities to gather and consider information before exploration or production and development can occur. ER213-14.

BOEM then set out in detail how these common themes applied to particular instances of incomplete or missing information identified in the EIS. ER215-308.

11

In many instances, several of the common themes were found to apply to particular data gaps. Upon completion of the analysis, none of the incomplete or missing information was found to be essential to a reasoned choice among alternatives, and accordingly BOEM found it unnecessary to take the next step under 40 C.F.R. §1502.22(a), which would have been to assess the overall cost of obtaining any missing information that was essential. SEIS E94, SER154.

The Environmental Protection Agency ("EPA"), which reviews NEPA documents pursuant to 42 U.S.C. §7609, stated after reviewing the SEIS that it was "particularly pleased with the methodical and understandable analysis of incomplete or missing information in Appendix A" and stated that BOEM's methodology "fully meets the intent of the Council on Environmental Quality's requirements for such situations." SEIS E94, SER154, *see also* SER198.

BOEM issued the final SEIS on August 26, 2011, and issued a new Record of Decision ("ROD") reaffirming Lease Sale 193 on October 3, 2011. ER407-447.

Plaintiffs filed a Second Supplemental Complaint on November 22, 2011, challenging the new decision solely under NEPA. Plaintiffs contended that the SEIS's treatment of missing and unavailable information was inadequate, and that BOEM violated NEPA by not analyzing the potential contribution to climate

12

change from the downstream consumption of oil and gas that might be produced from Lease Sale 193 development.

After briefing, the district court issued an Order of Dismissal, finding that BOEM had complied with NEPA in all respects. The court found, *inter alia*, that "BOEM has taken a 'hard look' at the environmental impact of this lease sale," and that it "has identified missing or incomplete information and has adequately evaluated it in a manner that is clearly sufficient at this stage of the development process to satisfy the requirements of 40 C.F.R. Section 1502.22." ER4-5. The case was dismissed, and this appeal followed.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision on summary judgment that an agency complied with NEPA. *N. Alaska Envtl. Ctr. v. Kempthorne,* 457 F.3d 969, 975 (9th Cir. 2006) ("*N. Alaska Envtl. Ctr.*"). Courts review an agency's compliance with NEPA under the Administrative Procedure Act. *Id.* A court may not set aside an agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). A decision is arbitrary and capricious if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is

so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*) (internal quotation marks omitted).

In reviewing agency compliance with NEPA, this Court has emphasized that "NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *N. Alaska Envtl. Ctr., supra*, 457 F.3d at 975, quoting from *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999). "Under this deferential standard, this court must defer to an agency's decision that is 'fully informed and well-considered.'" *N. Alaska Envtl. Ctr., supra*, 457 F.3d at 975, quoting from *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

## SUMMARY OF ARGUMENT

1. The SEIS provided a thorough analysis of each instance of incomplete or missing information identified in the EIS and plainly complied with 40 C.F.R. §1502.22. Plaintiffs simply disagree with BOEM's conclusion that none of the missing information was essential to a reasoned choice among alternatives for the lease sale. They fail, however, to show that BOEM relied on any improper factor, did not consider an important aspect of the problem, or offered explanations that

14

runs counter to the evidence or were so implausible that they could not be ascribed to a difference in view or the product of agency expertise.

It was clearly proper for BOEM to rely on the staged nature of the OCSLA process to find that missing information about impacts of oil and gas exploration or production was not essential to a reasoned choice among alternatives at the lease sale stage, as cases from this Court have repeatedly held that this is an appropriate factor to consider. Those same decisions make clear that BOEM may also rely on the future protections that will be afforded by the ESA, the Marine Mammal Protection Act, 16 U.S.C. §1361 et seq. ("MMPA"), and other statutes as a reason for finding that missing information at the lease sale stage is not essential.

Plaintiffs simply point to instances in the record where information gaps are indicated, but none of those instances suggest that obtaining the missing information was essential to a reasoned choice among alternatives at the lease sale stage. With regard to plaintiffs' only specific objection to a particular finding, BOEM reasonably found that additional information regarding the distribution and habitat needs of marine mammal species was not essential to a reasoned choice among alternatives, in light of the extensive amount of available scientific information on these species and their habitats, together with the fact that BOEM and other agencies will develop additional information and protective measures

15

before any oil production can proceed under the staged OCSLA process. Plaintiffs' objection to BOEM's use of common themes to address multiple instances of missing information is not well taken, as this choice of methodology for addressing missing relevant information is consistent with 40 C.F.R. §1502.22 and well within the agency's discretion.

2. Plaintiffs have not shown that it was arbitrary or capricious for BOEM to use a one billion barrel development scenario for analysis of possible impacts should development ultimately result from Lease Sale 193. The fact that there may be more technically recoverable oil in the Chukchi Sea area does not undermine BOEM's analysis, because as BOEM explained, it is also necessary to consider technical challenges and the high costs of operation in this frontier area, as well as the current lack of petroleum infrastructure and other logistical and regulatory hurdles to oil development. Making predictions about the likely scope of future oil development in the Chukchi Sea area is a matter squarely within the expert discretion of BOEM, and the Court should defer to BOEM's well-explained conclusion that a one billion barrel development scenario is reasonable for purposes of analyzing impacts of future oil development.

16

# ARGUMENT

## I

## BOEM'S DETERMINATION THAT IT WAS NOT ESSENTIAL TO OBTAIN MISSING INFORMATION AT THE LEASE SALE STAGE WAS NOT ARBITRARY OR CAPRICIOUS

BOEM complied with the procedural requirements of 40 C.F.R. §1502.22 by making individualized determinations of whether particular pieces of information identified as missing in the EIS were relevant to foreseeable significant effects on the environment and "essential" to a reasoned choice among alternatives. See SEIS App. A, ER211-308. Plaintiffs disagree with the substance of the BOEM's determinations that missing information was not "essential," contending that it was arbitrary and capricious for BOEM to find that it could proceed without additional information regarding species and habitat in the Chukchi Sea. Br. 29-30.[3]

---

[3] Plaintiffs do not challenge any determination by BOEM that particular missing information was or was not "relevant to reasonably foreseeable significant adverse impacts." 40 C.F.R. §1502.22. Nor have plaintiffs claimed that BOEM failed to consider a reasonable range of alternatives under 40 C.F.R. §1502.14. *Compare N. Alaska Envtl. Ctr.*, 457 F.3d at 978-79 (rejecting claim that EIS failed to consider reasonable range of alternatives). Rather, plaintiffs' claim before the district court and here is simply that BOEM was arbitrary and capricious in determining that missing information was not essential to a reasoned choice among alternatives. *See* Second Supp. Complaint, ER95 at ¶34 (alleging that BOEM's analysis of missing information does not allow for "an informed comparison * * * of the several alternatives to Lease Sale 193 contained in the EIS").

Plaintiffs fall far short of showing that in making these determinations "the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, at 987 (internal quotation marks omitted). Nor do plaintiffs show that BOEM made a "'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Id.* at 993.

Plaintiffs' challenges must be considered in the context in which this case arises, which is the second stage of the OCSLA's four-stage process for oil and gas leasing, exploration, and development activities. During this second stage of the process leases are issued, but "the purchase of a lease entails no right to proceed with full exploration, development, or production." *Sec'y of Interior v. California*, 464 U.S. 312, 339 (1984). Rather, "the lessee acquires only a priority in submitting plans to conduct those activities," and if those plans "when ultimately submitted, are disapproved, no further exploration or development is permitted." *Id. See also Village of False Pass,* 733 F.2d 605, 615 (9th Cir. 1984) ("the purchase of a lease entails no right to proceed with full exploration, development, or production * * *") (internal quotation marks and citation omitted).

18

This Court and other courts have long recognized "the general principle that the amount and specificity of information necessary to meet NEPA requirements varies at each of OCSLA's stages." *Village of Akutan,* 869 F.2d at 1192. In particular, "[w]e are the least troubled by what may seem to be incomplete or speculative data at the lease sale stage." *Id.* As this Court noted in upholding an EIS covering an on-shore Alaska lease sale, "uncertainty is an inherent problem with multi-stage projects such as oil and gas programs * * * [and] [t]he Secretary [of the Interior] plainly cannot be expected or required to wait until the totality of environmental effects is known." *N. Alaska Envtl. Ctr.*, 457 F.3d at 977 (9th Cir. 2006). Courts reviewing compliance with NEPA and other environmental laws at this lease sale stage recognize that missing information can, consistent with these statutes, be gathered during later stages of the process. *See Village of Akutan*, 869 F.2d at 1192 ("More accurate information will be available at later stages of the exploration process, and the Secretary can make appropriate alterations in the oil development plan at that time"); *Village of False Pass*, 733 F.2d at 616 (Interior can defer consideration of uncertain environmental factors, since the four stage review process gives it a "continuing opportunity for making informed adjustments" to ensure all activities are conducted in an environmentally sound manner) (internal quotation marks and citation omitted); *N. Alaska Envtl. Ctr.*, 457 F.3d at 977 ("we

19

conclude that the government was not required at this [lease sale] stage to do a parcel by parcel examination of potential environmental effects. * * * Such analysis must be made at later permitting stages when the sites, and hence more site specific effects, are identifiable").

Accordingly, plaintiffs bear an even heavier burden than usual in seeking to show that BOEM was arbitrary or capricious in determining that it was not "essential" to fill data gaps at this early lease sale stage of the OCS process.  While plaintiffs acknowledge that "OCSLA's staged development encourages staged consideration of uncertain environmental factors,"  Br. 37, citing *Vill. of False Pass*, 733 F.2d at 616, they fail to cite a single case where a court has found missing information to be essential, or otherwise found a violation of 40 C.F.R. §1502.22, in the context of a challenge to a lease sale under the OCSLA or similar statutory scheme.  And they have fallen far short of showing that this is the unusual case where the only rational conclusion BOEM could draw is that certain missing information was essential at this early stage of the process.

**A.  It was not Arbitrary or Capricious for BOEM to Find that Incomplete Information Regarding the Distribution and Habitat of Marine Mammals Was Not Essential.** – Plaintiffs' primary contention is that "because of the lack of data on marine mammal distributions and habitat use in offshore areas of

20

the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas," and that "[b]ecause of missing data about the location and species' use of these offshore areas," BOEM was allegedly unable to formulate "alternative deferral areas that would minimize effects to species using these offshore areas." Br. 40; *see also* Br. 13-16 (missing information about possibly important offshore habitat areas allegedly "hindered" formulation of lease sale alternatives); Br. 37 (same); Br. 46 (same). There are multiple flaws in this challenge to BOEM's finding that missing information regarding offshore habitat areas was not essential to a reasoned choice among alternatives for the Lease Sale 193 decision. First, while plaintiffs posit an alleged "information vacuum" (Br. 38), the record demonstrates that there was extensive scientific information available on use by marine mammals and other species of particular areas of the Chukchi Sea. *See, e.g.*, SEIS E2, SER62 (noting the more than 400 study reports and more than 300 articles in peer-reviewed scientific journals developed pursuant to BOEM's Environmental Study Program relating to the Alaska OCS); SEIS E29, SER89 (describing "large body of information regarding the Chukchi Sea environment has been compiled, especially within the last 35 or so years * * *").

Second, plaintiffs improperly ignore BOEM's reasonable explanations for why additional information on this subject was not essential to a reasoned choice

among alternatives. While plaintiffs contend (Br. 42) that "BOEM never explained why the information it has allows it to choose among and design alternatives in the face of substantial data gaps," the SEIS in fact clearly explains why available data enabled BOEM to design and choose among alternatives, and why in particular BOEM designed alternatives that deferred leasing in areas closest to the Alaska coast. The SEIS points out that:

> Decades of study in the region have elucidated the heightened importance of many areas within the Chukchi Sea as well as the North Slope. The understanding that certain areas of the Chukchi Sea are of special importance is reflected in recent decisions, such as the Secretary's 25 Statute mile deferral in the 2007-2012 Five-Year Program as well as the selection of Alternative IV (which included a corridor deferral) from the Sale 193 FEIS for the decision on Lease Sale 193. Within the present Final SEIS, special consideration is given to coastal communities, the spring lead system, subsistence harvest areas, migratory corridors, Ledyard Bay Critical Habitat Unit, Kasegaluk Lagoon, Hanna Shoal, avian breeding colonies such as Cape Lisburne and Cape Thompson, designated Essential Fish Habitat, caribou calving grounds and insect relief areas, special vegetative communities, marine mammal haulout areas, and many other spatial areas.

SEIS E30-31, SER90-91; see also SER155 (finding that existing information is "sufficient to support sound scientific judgments and reasoned managerial decisions about where to allow oil and gas activities and about which areas are biologically significant").

22

Both the 2007 EIS and the 2011 SEIS thoroughly describe the information that led BOEM to develop three specific lease deferral alternatives that focused on areas within 60 miles of the coast. These areas near the coast are where important subsistence activities occur, and where biologically significant features like the spring lead system used by many species including the entire spring migration of bowhead whales are located, as well as important coastal lagoons, rookeries, and haul out areas. *See* ER940-950 (EIS compares effects of different alternative deferral areas on biologically significant areas); SER37 (SEIS confirms that "[b]owhead whales travel mostly parallel and within 40 miles of the Alaskan coast during spring migration (Quakenbush, Small, and Citta, 2010)"); SER50 (studies show that belugas "migrat[e] around western and northern Alaska along the spring lead system in April and May" and "move into shallow coastal or estuarine waters during at least a portion of the summer"); SER38 ("Spectacled eiders make use of the spring lead system when they migrate"); SER40 (detailing use by Steller's eiders of areas within 2 km of shore near Ledyard Bay and Icy Cape).

BOEM also considered extensive data on habitat areas further offshore that are used by walrus, polar bears, seals and other species and found that it was adequate for making determinations about likely impacts of Lease Sale 193 and alternatives thereto. SEIS at SER48, 53-54, 122-26 (reviewing data on habitat

23

needs of walrus, belugas and other whales, polar bears and seals); SER35-36 and 113 (SEIS discusses new information on fish species and offshore habitat). On the basis of this available information, BOEM found no scientific basis for developing alternatives that would defer areas further than 60 miles from shore, since use by marine mammal species of offshore areas depends primarily on the shifting seasonal position of pack ice, rather than being concentrated in fixed locations that can be protected by deferring leasing of particular tracts. *See* SEIS at SER48-49 (location of walrus and seals depends on the shifting location of pack ice, except when they use coastal haul out areas); *see also* SER123-26 (considering habitat needs of beluga, walrus and seals). As the SEIS explains:

> Recent studies assessing the variability of marine mammal movement confirm the current approach of deferring areas closer to the spring lead system (where there is a relatively well-defined migration corridor) but not other areas of the Chukchi Sea Program Area (which typically experience less concentrated and more variable use by marine mammals over the long-term).

SER124. *See also* SER117 (since "[t]he fall migration corridor remains poorly defined (ADF&G, 2010) and the bowhead migration is not as sensitive or constrained as during the spring period [], [t]here is no evidence supporting the

24

deferral of additional specific portions of the Lease Sale 193 area to benefit bowheads during their fall migration").[4]

In light of this substantial body of available data, it was reasonable for BOEM to conclude that additional data regarding offshore habitat needs of marine mammals and other species was not "essential" to a reasoned choice among alternatives at the lease sale stage. As the SEIS explains, while "there will be some level of incomplete information on marine mammal ecology in the Chukchi Sea," nevertheless "sufficient information is available to support sound scientific judgments and reasoned managerial decisions at the lease sale stage." ER217; *see also* SER124 ("[m]arine mammal habitat preferences are complicated; however, there is a great deal of information available on habitat preferences based upon water depth, season, ice type and ice coverage for all of the species mentioned. Recent tagging studies have furthered our knowledge base about speed and frequency of movements, and confirmed prior information about habitat preferences").

---

[4] Tagging studies, for instance, showed that while the spring migration of bowhead whales occurs within 40 miles of the coast, and is thus protected by the lease deferral areas, bowheads in fall migrate generally south taking highly variable routes, rendering it infeasible to impose additional protections through deferring particular lease parcels. *See* SEIS at 62-63 and Figure 8 (SER41-42) (showing tracks of tagged bowheads during fall migrations); *see also* Figure 9 at 73 (SER52) (showing highly variable locations of tagged ringed and bearded seals, beluga and bowhead whales).

25

As the SEIS further notes, activities with the potential to affect marine mammals and other species will be subject to additional review processes by BOEM, NMFS and FWS, and "[a]ppropriate mitigation measures can and will be applied as proposals for specific activities are submitted." ER217. "Significant impacts will be avoided under all alternatives through ESA Section 7 [16 U.S.C. §1536(a)(2)] consultation and substantive ESA and MMPA requirements." ER218. Thus, if exploration or development were proposed in a leased area that is found to be important habitat, BOEM retains discretion to mandate modifications to operations to ensure that the species will not be significantly affected. SER271-72 (Lease Stipulation No. 1 authorizes BOEM to require lessees to relocate site or operations or take other protective measures "[i]f previously unidentified biological populations or habitats that may require additional protection are identified * * *"). If exploration or development is permitted at the third and fourth stages of the OCSLA process, BOEM can impose additional mitigation measures to protect species, such as timing limitations to avoid migrations and to accommodate subsistence hunting, designated travel routes to avoid critical habitat, and requirements to keep certain distances from animals and habitat areas. *See* 43 U.S.C. §1340(c) (approval of exploration plans); 43 U.S.C. §1351 (approval of development and production plans).

26

BOEM's conclusion that additional information on the distribution and habitat needs of these species was not essential at this stage to a reasoned choice among alternatives, based on its technical expertise regarding oil and gas exploration and development in the dynamic Arctic environment, was plainly reasonable and thus is entitled to substantial deference. *Lands Council v. McNair,* 537 F.3d at 993 (court should conduct "particularly deferential review of an agency's predictive judgments about areas that are within the agency's field of discretion and expertise * * * as long as they are reasonable").[5] As the preceding discussion shows, there is no basis for plaintiffs' claims (Br. 42) that BOEM's explanations were "conclusory" or inconsistent with the record. BOEM's conclusions were fully explained in the SEIS and are well supported by the record;

---

[5] The SEIS similarly examined all instances of incomplete or unavailable information regarding birds (SER43-48, 120-21), and found that missing information was not essential to a reasoned choice among alternatives in light of the extensive available information on bird species, the protections birds will receive under the Migratory Bird Treaty Act, 16 U.S.C. §703 *et seq.*, and the fact that additional protective measures can be taken at later steps in the OCSLA process. ER278. It also examined incomplete or unavailable information on fish species (SER34-36, 112-13) and reaches a similar conclusion that they are not essential, noting that activities with the potential to affect fish species will be subject to further environmental review, including Essential Fish Habitat consultation under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §1801 *et seq.*, where additional mitigation measures can be developed if necessary. *See* ER220-21. Plaintiffs do not specifically challenge these findings.

they are also consistent with the OCSLA scheme of phased development and with NEPA and the requirements of 40 C.F.R. §1502.22.

**B. It Was Not Arbitrary or Capricious for BOEM to Rely on Thematic Responses to Explain Why Missing Information Was Not Essential.** – Aside from the issue discussed above regarding alleged "data gaps for key species like bowhead whales, beluga, and walrus," (Br. 38), the opening brief does not challenge any specific BOEM conclusion regarding particular incomplete or missing information.[6] Instead, plaintiffs protest BOEM's use of what they refer to as "five boilerplate justifications" (Br. 41) which they claim are inconsistent with the agency's NEPA obligations (Br. 44).

BOEM thoroughly explained its approach to complying with 40 C.F.R. §1502.22 by utilizing five "common themes" that became apparent as BOEM reviewed all instances of missing information. *See* SEIS App. A, ER213-14. Nothing in 40 C.F.R. §1502.22 precludes an agency from organizing its analysis as BOEM did here, utilizing common themes that explain why multiple instances of incomplete or missing data are not essential to a reasoned choice among alternatives

---

[6] Plaintiffs accordingly have waived any challenge to other specific BOEM determinations regarding whether particular items of missing information were essential within the meaning of 40 C.F.R. §1502.22. *See Greenwood v. F.A.A.,* 28 F.3d 971, 977 (9th Cir. 1994) ("[w]e review only issues which are argued specifically and distinctly in a party's opening brief").

regarding the lease sale decision. This Court has made clear that in complying with CEQ regulations, an agency is "free to * * * use any [] procedure it deems appropriate," and "[i]t is not for this court to tell the [agency] what specific evidence to include, nor how specifically to present it." *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Service,* 549 F.3d 1211, 1218 (9th Cir. 2008) (rejecting challenge to Forest Service's compliance with 40 C.F.R. § 1508.7 regarding cumulative impacts in an EIS). This Court there found that the *en banc* decision in *Lands Council v. McNair* bars reviewing courts from requiring an agency to "use any particular method" to comply with a CEQ regulation, and requires a court to uphold the agency's chosen method "to the extent that [the CEQ regulation] does not *explicitly* provide otherwise." *Id.* (emphasis added). *See also Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1359 (9th Cir. 1994) (in finding that agency complied with 40 C.F.R. §1502.22, Court stresses that when dealing with missing or unavailable information, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if * * * a court might find contrary views more persuasive") (internal quote marks and citation omitted).[7]

---

[7] Other courts that have considered this issue have held that agencies possess broad discretion to determine the manner in which to make the determinations called for by 40 C.F.R. §1502.22. *See Habitat Educ. Center, Inc. v. U.S. Forest Service,* 673 F.3d 518, 532 (7th Cir. 2012) (in upholding compliance with 40 C.F.R. §1502.22,

29

The method BOEM chose to comply with 40 C.F.R. §1502.22 here was reasonable, and does not in any way conflict with the plain language of that regulation. As noted *supra* at 12, EPA reviewed the SEIS pursuant to 42 U.S.C. §7609, and stated that it was "particularly pleased with the methodical and understandable analysis of incomplete or missing information in Appendix A" and that BOEM's methodology "fully meets the intent of the Council on Environmental Quality's requirements for such situations." SER154, 198.

Accordingly, BOEM's reliance on thematic responses was not arbitrary or capricious. In any event, plaintiffs' specific attacks on BOEM's thematic responses lack substance, as we now show.

---

court finds that "[t]he regulations do not prescribe the precise manner through which an agency must make clear that information is lacking," and "[t]he manner by which Forest Service elected to convey its lack of information was not a clear error of judgment or otherwise contrary to law"); *Colorado Environmental Coalition v. Dombeck* 185 F.3d 1162, 1172-1173 (10ᵗʰ Cir. 1999) (court refuses "to give a hyper-technical reading" to 40 C.F.R. §1502.22 to require a particular format of disclosure regarding incomplete or unavailable data, since "Congress did not enact the National Environmental Policy Act to generate paperwork or impose rigid documentary specifications"). This case authority is consistent with CEQ's own statement at 40 C.F.R. §1507.1 that "[i]t is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures * * * to the requirements of other applicable laws."

**1. BOEM's Findings of Sufficient Information Were Logical and Supported by the Record.**

Plaintiffs assert (Br. 42) that it was logically inconsistent for BOEM to concede that there was missing information but still find that sufficient information was available to make the necessary determinations. On the contrary, the very premise of Section 1502.22(a) is that not all missing information is essential to reasoned choices among alternatives. The determinations in SEIS Appendix A are not inconsistent with statements in the original EIS regarding the existence of missing information because none of those statements indicated that the missing information was essential to a reasoned choice among alternatives. The SEIS expressly considers that issue for each instance of missing information identified in the EIS. To the extent there is any inconsistency between the analysis of the SEIS and the EIS on the issue of "essential" information (which there is not), the SEIS supersedes the earlier analysis. *See* ER131 (SEIS relies on existing analysis in Sale 193 EIS only "where appropriate," and contains new data and analysis that "provides the Secretary with sufficient information to affirm, modify, or cancel the Department's previous decision on Sale 193").

As indicated *supra* at 21-26, the record demonstrates that BOEM relied on extensive available information to make its determinations. BOEM's

31

determinations "recognize[] that while there will always be some level of incomplete information (especially regarding dynamic ecosystems), there is often enough information to formulate and support sound scientific judgments." SEIS A3, ER213. As BOEM pointed out, "[s]cientists frequently agree on larger issues and trends despite the lack of a particular item of information," and quite often missing information "is simply not of a type that would alter scientific judgments or affect decision-making." *Id.* This was the case for many if not most of the instances of information gaps identified in the EIS, as BOEM's explanations in SEIS Appendix A make clear, and nothing in these explanations conflicts with the fact that information gaps had been identified.

## 2. Reliance on the OCSLA Staged Process Was Appropriate.

Plaintiffs' objection (Br. 43-44) to BOEM's reliance on the four-stage OCSLA process in its analysis is clearly without merit, since it is contrary to decisions of the Supreme Court, this Court and other courts holding that the broad authority reserved to Interior under the OCSLA to modify or prohibit actions at later stages justifies lease sale determinations made with incomplete information regarding potential impacts of oil and gas development. *See Sec'y of Interior v. California*, 464 U.S. at 340-41 (finding that Congress intentionally separated OCS development into four stages "to forestall premature litigation regarding adverse

32

environmental effects that all agree will flow, if at all, only from the latter stages of OCS exploration and production"); *Village of False Pass,* 733 F.2d at 616 ("staged development encourages staged consideration of uncertain environmental factors"); *Village of Akutan,* 869 F.2d at 1192 ("the amount and specificity of information necessary to meet NEPA requirements varies at each of OCSLA's stages"); *North Slope Borough v. Andrus,* 642 F.2d 589, 605-06 (D.C. Cir. 1980) ("[t]he Secretary [of Interior] plainly cannot be expected or required to wait until the totality of environmental effects is known;" since "[u]ncertainty over remote hazards can be rectified as more information is collected"); *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1378 (2d Cir. 1977) ("where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a * * * change after the information is * * * incorporated in a further EIS, it cannot be said that deferment violates the 'rule of reason.'"); *Sierra Club v. Morton*, 510 F.2d 813, 828 (5th Cir. 1975) ("[b]ecause [the OCSLA] contemplates numerous, successive lessor-lessee relationships involving activities over many areas and over many years, the agency's continuing opportunity for making informed adjustments has a major

33

effect upon our evaluation of the sufficiency of the materials contained in the EIS itself").

Plaintiffs' argument (Br. 43) that it was essential to obtain missing information because "[a]fter a lease sale, [the Secretary's] decisions are more constrained," was specifically rejected by this Court in *Village of False Pass. See* 733 F.2d at 615 ("[w]e do not find these apparently minor alterations of the Secretary's discretion between the initial and subsequent stages sufficient, by themselves, to make missing information about a 100,000 barrel oil spill important at the lease sale stage"). *Village of False Pass* and the other cases cited above make clear that NEPA does not alter the substantive determinations made by Congress in the OCSLA regarding the role of uncertainty and missing information at the lease sale stage. NEPA and 40 C.F.R. §1502.22 simply provide a process for agencies to take a "hard look" at existing data and at the implications of data gaps, consistent with the directives of the OCSLA. As the SEIS makes clear, BOEM took that hard look here.[8]

---

[8] Instead of dealing with cases like *Village of False Pass* and *Village of Akutan* that consider OCSLA's phased development, plaintiffs rely (Br. 35, 38) on cases that involved one-time actions such as timber sales, *see Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 964-65 (9th Cir. 2005), land exchanges, *see Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809-10 (9th Cir. 1999), and highway construction, *see Southeast Alaska Conservation Council v. Federal Highway Admin.,* 649 F.3d 1050, 1052 (9th Cir. 2011). Those cases shed no light on whether missing information is essential at the lease sale stage of the

### 3. BOEM Properly Considered Other Statutory Protections.

This same case authority also refutes plaintiffs' contention (Br. 44) that

BOEM erred by considering the protections that wildlife and other resources would

receive under statutes like the ESA and MMPA at later stages of the OCSLA

process.  In *Village of False Pass*, this Court rejected a claim that there was

insufficient information about potential effects on whales for the Secretary to hold a

lease sale of tracts in the Bering Sea by pointing out that:

> With each exploration plan, development and production plan,
> or permit to drill, the Secretary must: implicitly conclude that
> any approval does not affect an endangered species, *see* 50
> C.F.R. § 402.04(a)(2) (1982); take appropriate steps to insure,
> on the basis of his previous consultation with the Fisheries
> Service, the absence of jeopardy to an endangered species; or
> reinitiate formal consultation, *see, e.g., Village of False Pass v.*
> *Watt,* 565 F.Supp. at 1161 & n. 28 (strong suggestion that formal
> consultation about oil spill risks on whales will be required at
> the exploration stage); 50 C.F.R. § 402.04(h) (1982).

733 F.2d at 602.  *False Pass* makes clear that it is appropriate at the lease sale stage

to rely on the fact that the agency will be required to "diligently pursue ESA

compliance after the lease sale * * *."  *Id*.  Similarly in *North Slope Borough*, the

D.C. Circuit found it relevant that the ESA, the MMPA, and the OCSLA "all

_____

phased OCSLA process.  Plaintiffs' reliance on *Pac. Rivers Council v. U.S. Forest*
*Serv.*, _ F.3d _, 2012 WL 2333558 at *16-17 (9th Cir. 2012), is misplaced because
that case dealt with *available* information about fish impacts that the agency had
included in an earlier EIS but failed to include in the EIS at issue, not unavailable
information.

35

authorize the Secretary to judge activities taking place under the leases on an ongoing basis and to suspend any such activity which jeopardizes the environment," and further stressed that "strictures placed in these statutes for the environment's protection will condition the lessees' rights as well as the obligations of the Secretary." 642 F.2d at 594-95.

This Court has found it appropriate for BOEM to rely on the application of protections from other statutory schemes even at later stages of the OCSLA process. *See Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 789 (9th Cir. 2001) (in upholding EIS on an OCS development and production plan, Court holds it was reasonable for BOEM's predecessor to rely on existence of Clean Air Act permitting process as adequately addressing potential air quality impacts). Accordingly, future application of the protections of the ESA, MMPA, and similar statutes is a plainly relevant consideration when BOEM is determining whether to proceed with a lease sale in the face of incomplete information.[9]

---

[9] Plaintiffs again mistakenly rely (Br. 44-45) on cases that considered one-time decisions, rather than a phased development process, and that are distinguishable on other grounds as well. *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (approval of mine expansion, where agency wholly failed to consider air pollution effects of ore transport); *S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1479-80 (9th Cir. 1983) (herbicide spraying project considered under a version of 40 C.F.R. §1502.22 that has since been significantly amended); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (approval of railway line where, unlike here, agency had not considered up-to-date data).

### 4. Additional Analysis of Oil Spill Impacts Was Not Required.

Plaintiffs attack (Br. 44-45) the SEIS for assuming that a large oil spill would cause adverse impacts and explaining that additional information about how those impacts might come about would not be useful in illuminating a choice among potential lease sale alternatives. See SEIS at A3 (ER213), A80 (ER290). BOEM's decision to present impacts of an event that could occur only at later stages of the OCSLA process by making a conservative assumption that any large oil spill would cause significant impacts was well within the agency's discretion. This Court held in *Village of False Pass* that since a large oil spill could only occur at a later stage in the OCSLA process, and since the agency would have additional opportunity to consider oil spills at those stages, information about the differential impacts of a 100,000 barrel spill as opposed to the 10,000 barrel spill studied in the lease sale EIS was not essential. 733 F.2d at 615-17. This Court confirmed in *N. Alaska Envtl. Ctr.*, 457 F.3d at 976-77, that at the lease sale stage environmental analysis may rely on assumptions about impacts, which can be modified if and when further information concerning future site-specific action becomes available.

Even apart from the fact that this EIS and SEIS are from an early stage of a multi-stage process, NEPA simply does not forbid agencies from dealing with uncertainty by utilizing conservative assumptions about impacts. *See, e.g.*,

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 100 (1983) (upholding Nuclear Regulatory Commission's use of generic assumptions regarding impacts of nuclear fuel disposal, and noting that "NEPA does not require agencies to adopt any particular internal decisionmaking structure"); *Edwardsen v. U.S. Dept. of Interior,* 268 F.3d at 785-86 (even at development stage of the OCSLA process, court should not second-guess Interior's judgment that data from a generic oil spill trajectory analysis is adequate for assessing impacts). BOEM's utilization of conservative assumptions about the common impacts of oil spills here was not arbitrary or capricious.

### 5. BOEM Properly Responded to the USGS Report.

Plaintiffs make a misguided attack on BOEM's response to the report entitled "An Evaluation of the Science Needs to Inform Decision on Outer Continental Shelf Energy Development in the Chukchi and Beaufort Seas, Alaska," prepared by the United States Geologic Survey ("USGS"). While plaintiffs claim that "BOEM did not attempt to collaborate with USGS" and simply "concluded the USGS report was not relevant" (Br. 22), BOEM in fact gave careful and detailed consideration to the report, which it found "to contain valuable summary and synthesis regarding information strengths and weaknesses in the Arctic." SEIS E122 (SER182). BOEM included in the SEIS a detailed 15-page analysis that assessed each

recommendation in the USGS report and described ongoing and planned studies that responded to those recommendations, as well as recent study reports relating to those topics. SER180-95.

BOEM reasonably concluded that the USGS report "does not, however, alter [BOEM's] assessment of whether current information is adequate to support a decision on Lease Sale 193." SER182. BOEM pointed out that "[m]any of the data gaps expressed in the USGS Report were identical or substantially similar to those already addressed as part of the SEIS process," and "[i]n other instances—as appropriately noted by USGS – there exist information gaps that should be addressed before future planning of development and production activities on the OCS, but do not need to be addressed at the leasing and exploration stage of the OCS oil and gas process." SER87; *see also* SER31. BOEM made clear that it "will continue to consider the report's recommendations, which will help guide ongoing and future efforts to collect additional information." SER182.

Plaintiffs point to nothing in the USGS report that contradicts BOEM's conclusion that the report did not indicate that obtaining missing information was essential for a reasoned choice among alternatives. While plaintiffs seek to portray one statement in the report as finding that missing information about whales and other species "serves as a 'major constraint[] to a defensible science framework for

39

critical Arctic decision making,'" (Br. 21, quoting USGS report at 151, ER353), the passage when read in its entirety shows that USGS was not speaking either about whales or the lease sale stage, but was discussing research needs relating to the assessment of natural resource damages in the event of a possible oil spill:

> Discussed in this section are those research needs required to defensibly assess resource injuries, recovery progress, and restoration approaches should oil be released. Our intent is not to suggest that a spill is likely, but to think through such a scenario in a very broad sense and identify approaches and types of scientific information that might reduce societal uncertainties about government capacity to deal with the consequences of oil spills in the Beaufort Sea or Chukchi Sea Planning Areas.

SER199. This statement about research needs related to natural resource injuries in no way suggests that such information was essential to a reasoned choice among alternatives at the lease sale stage.

In sum, plaintiffs have failed to show any deficiency in BOEM's extensive and careful analysis of every information gap identified in the EIS. ER211-308. Plaintiffs simply assert (Br. 40) that, "[a]bsent different or additional analysis than that contained in the EIS, the conclusion that not a single piece of missing information is essential to the lease sale thus contradicts the analysis in the EIS and is arbitrary." Plaintiffs' premise that 40 C.F.R. §1502.22 required BOEM to find that at least one piece of missing information was essential is illogical and wholly without merit. Particularly since the decision here was at an early stage of the

OCSLA process, it is not at all surprising that BOEM, after careful and well-explained analysis, found that none of the information it identified as missing or unknown is essential to a reasoned choice among alternatives at the lease sale stage. The district court judgment upholding BOEM's analysis should be affirmed.

**II**

**IT WAS NOT ARBITRARY OR CAPRICIOUS FOR BOEM TO USE A ONE BILLION BARREL DEVELOPMENT  SCENARIO FOR ANALYSIS OF POSSIBLE IMPACTS**

Even though the decision here only involved leasing, BOEM considered possible impacts, including from oil spills, that could occur should leasing lead to eventual oil field development.  EIS at ES-4-7 (SER287-90).  Since the scale of impacts would depend on the scope of any such future development, BOEM needed to choose a scenario on which to base its analysis.  As this Court pointed out in *Village of Akutan*, "[p]rior to exploration, it is difficult to make so much as an educated guess as to the volume of oil likely to be produced or the probable location of oil wells."  869 F.2d at 1192.  Nevertheless, BOEM provided a reasonable discussion here by developing a scenario, which it explained was a "conceptual view[] of the future and represent[s] possible, though not necessarily probable, sets of activities." ER856.

41

BOEM based this scenario on several factors, all of which are within its field of expertise:

> To develop the scenarios we consider the petroleum-resource potential of the area, the technology to explore and produce oil and gas from the offshore area, and industry trends in northern Alaska.

*Id.* The EIS referenced the most recent (2006) available petroleum assessment for the Chukchi Sea, which indicated "mean technically recoverable resources of 15.4 billion barrels of oil." ER857. However, "the very high costs of all operations cause most of this resource endowment to be sub-economic, even at high oil and gas prices." *Id.* The EIS noted that "5 exploration wells have already tested some of the largest prospects [in the Chukchi] without making a commercial-size oil discovery." *Id.* It also noted that oil development in this "remote, high-cost location" faces numerous "logistical and regulatory hurdles," and that at present "[n]o permanent petroleum infrastructure exists in this remote area." *Id.*

All of these factors mean that choosing a scenario based on the amount of technically recoverable resources would hardly be reasonable, let alone required as plaintiffs contend. As the EIS explained, petroleum resource assessments of Chukchi Sea hydrocarbon resources are simply projections premised upon a set of "unrealistic assumptions," including "that the entire area is open to leasing; industry will completely explore the area in a very short timeframe (less than 20 years);

42

regulations will not inhibit industry activities; and all economically viable resources will be developed, even if they are only marginally profitable." ER858.

In fact, as the EIS notes, "[t]he most realistic prediction of the future would be for exploration only activities" with no production at all.[10] The EIS does not use the "most realistic" scenario of no production because it "would not provide for a thorough NEPA analysis." *Id.* Instead BOEM decided that an appropriate scenario for purposes of analyzing impacts would be to assume "the discovery, development, and production of the first offshore project" which would likely be "a relatively large project that supports the cost of initial infrastructure." ER857. BOEM found that such a field would have to be in the one billion barrel range to warrant the very large infrastructure costs that would be required. ER858. BOEM noted that "[a]lthough the probability of a large 1 billion barrel development project is only about 10 percent, [BOEM] estimates that any smaller discoveries would be insufficiently economic to support the high cost, and the logistical and regulatory hurdles, faced by the first offshore project in the area." *Id.*

Accordingly, the record refutes plaintiffs' claim (Br. 51) that the one billion barrel scenario is "untethered from the resource estimates and development

---

[10] Thus, plaintiffs' claim (Br. 48) that the one billion barrel scenario represents the "absolute floor of potential industrial activity," is wrong – the lowest and likeliest level of development is no production at all, as the record indicates. ER857.

43

projections." It is squarely based on a realistic appraisal of all pertinent factors, including resource estimates *and* prospects for eventual development. Moreover, a one billion barrel development is hardly a "minimum sized field" as plaintiffs characterize it at Br. 50. *See* ER857 (hypothesized development would be "a relatively large project that supports the cost of initial infrastructure"). Plaintiffs' argument that BOEM was required to assume more extensive development based simply on the size of technically recoverable reserves ignores all of the other relevant factors (remote location, lack of infrastructure, regulatory hurdles, etc.) that make greater development highly speculative.

Plaintiffs' argument (Br. 53-54) that NEPA required BOEM to consider a larger development scenario with higher oil spill risks simply because such development is theoretically possible conflicts with the Supreme Court's clear holding that NEPA does not impose any requirement that agencies conduct a "worst case" analysis. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 354 (1989). Indeed, even when a "worst case" analysis was required by CEQ regulations (which were amended in 1986 to remove that requirement),[11] this Court in *Village of False Pass* found that the appropriate time to conduct a "worst case"

---

[11] *See* 51 Fed. Reg. 15,618 (1986) (rescinding previous requirement in 40 C.F.R. §1502.22 that EISs include "worst case analysis" where missing information was essential and cost of obtaining it was exorbitant).

44

analysis would be at the development stage, when the scope of likely development is known, not at the lease sale stage when the scope of development is speculative. 733 F.2d at 614-17.

Plaintiffs' Statement at Br. 25-26 points out that some earlier EISs prepared on lease sales took a different approach by developing production scenarios based on different possible levels of development (high, medium and low). The opening brief, however, does not develop any argument that the difference in approach between this EIS and earlier ones was arbitrary or unexplained, merely mentioning the different approach at Br. 50. *See Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 987 (9th Cir. 2011) ("a bare assertion does not preserve a claim"). And even if plaintiffs have preserved a claim based on this difference, it would fail. The EIS reasonably explained the difference in approach by explaining that "[t]o provide a more concise, reader-friendly, and useful analysis of potential effects and impacts of proposed activities [the agency] has begun to streamline its EIS's." EIS at II-1, SER293. For that reason, the lease sale 193 EIS would not contain scenarios based on different possible levels of development (high, medium, and low) as in some past EISs, but would use "a composite of this information in a single-case analysis." *Id.* An agency cannot be overly constrained by its earlier

45

approach, unless its current choice of methodology reflects a "clear error of judgment." *Lands Council*, 537 F.3d at 993–94.

Plaintiffs identify no legal requirement that BOEM structure its development scenarios in a particular way. Choosing an appropriate methodology to present the possible effects of uncertain future development is clearly within the agency's discretion. A reviewing court is "most deferential when the agency is making predictions, within its [area of] special expertise * * * [and] conduct[s] a particularly deferential review of an agency's predictive judgments about areas that are within the agency's field of discretion and expertise * * * as long as they are reasonable." *Lands Council v. McNair* 537 F.3d at 993. In selecting a scenario for analysis, BOEM was making a predictive judgment about the likelihood and scope of oil development, a matter squarely within its field of discretion and expertise. It is always possible to hypothesize different scenarios, such as plaintiffs' suggestion (Br. 50) that an initial one billion barrel development will "catalyze" further developments in the area. The question, however, is not whether other outcomes are possible, but simply whether it was arbitrary and capricious for BOEM to choose the one billion barrel development as a reasonable scenario for analyzing future impacts when oil and gas production may not occur at all, and if it does will take place after much additional study is undertaken and additional approvals

46

granted pursuant to the phased process of the OCSLA. Plaintiffs cannot show that BOEM "entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." 537 F.3d at 987. The district court's judgment finding that this aspect of the EIS complies with NEPA should be affirmed.

## III

### VACATING THE LEASES OR OTHER INJUNCTIVE RELIEF WOULD NOT BE AN APPROPRIATE REMEDY FOR ANY NEPA VIOLATION

The Court should reject the plaintiffs' contention (Br. 55-59) that any deficiency found in BOEM's decision should lead to vacating the lease sale and the leases themselves, or to an injunction against activities under the leases. As this Court reaffirmed in a recent decision considering the remedy of vacatur, if errors are found in an agency's work the reviewing court "must balance these errors against the consequences of such a remedy." *California Communities Against Toxics v. U.S. E.P.A.,* __ F.3d __, 2012 WL 3038520, *3 (9th Cir. 2012). In that case, the Court found invalid an EPA rule that made certain Clean Air Act credits available for a power plant under construction. After balancing the flaws in the agency decision against the consequences of vacating the decision, the Court found that "[t]he delay and trouble vacatur would cause are severe," and ultimately

47

ordered "remand without vacatur so that construction of [the power plant] may proceed without delay." *Id. See also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("when equity demands, [a challenged action] can be left in place while the agency" cures the defect).

Even if plaintiffs were to prevail on theories that BOEM failed to properly analyze missing information under 40 C.F.R. §1502.22 or improperly chose a development scenario for analyzing impacts of future production, vacating the lease sale or an injunction against activities under the leases would be an unnecessary step with harmful consequences to lessees, the government and the public. As the Secretary pointed out in his decision to reaffirm Sale 193 after completion of the SEIS, vacating the leases would require the government to refund over $2.6 billion in bonus bids as well as rental monies collected to date, and would preclude the potentially significant economic and employment benefits and the increased energy security that oil and gas development would provide. ER444-46. Congress decreed in the OCSLA that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3). The Supreme Court and this Court have made clear

48

that this stated policy weighs against the sort of injunctive relief sought by plaintiffs here. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544-46 (1987) (vacating injunction against exploration activities); *Tribal Village of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988) (lifting injunction against OCSLA lease sale based in part on "the public interest in developing oil and gas reserves").

On the other hand, vacating the leases or enjoining activity under them is not necessary to prevent harm to plaintiffs. Decisions of this Court recognize that "any technical deficiencies at the lease sale stage are unlikely to result in environmental damage, as a lease sale 'does not directly mandate further activity that would raise an oil spill problem.'" *Village of Akutan*, 869 F.2d at 1192, *quoting from Village of False Pass*, 733 F.2d at 616. That is the case here. In the event that this Court were to find a deficiency in BOEM's NEPA compliance, it could be remedied well before any decisions must be made about oil development or production. And while exploration activities pursuant to an approved exploration plan under the OCSLA may occur during the course of any remand, those would be conducted pursuant to a separate review and approval process under the Act. *See* 43 U.S.C. §1340(c). Indeed, this Court has already reviewed and affirmed BOEM's approval of the Chukchi Sea exploration plan submitted by intervenor Shell Gulf of Mexico, Inc., rejecting claims by many of these same plaintiffs. *See Inupiat Community of*

the *Arctic Slope v. Salazar,* 2012 WL 1929971 (9th Cir. 2012) (unpublished

memorandum decision); *see Native Village of Point Hope v. Salazar,* 680 F.3d 1123

(9th Cir. 2012) (companion published opinion referred to in *Inupiat Community*

upholding similar exploration plan in Beaufort Sea). This Court also recently

upheld findings by the United States Fish and Wildlife Service under the Marine

Mammal Protection Act, 16 U .S.C. §1371(a)(5)(a), that oil and gas exploration

activities in the Chukchi Sea during the period 2008-2012 will affect only "small

numbers" of polar bear and walrus, and have only a "negligible impact" on these

marine mammal species or stocks. *Ctr. for Biological Diversity v. Salazar* , __ F.3d _

_, 2012 WL 3570667 (9th Cir. 2012). These cases confirm that harm to the resources

of the Chukchi Sea area is unlikely to occur during any remand, and that vacatur or

other injunctive relief would be inappropriate.[12]

---

[12] If, despite the above, the Court were to conclude that injunctive relief of some
sort may be warranted, the many factual questions that would be presented by the
question of the necessity and scope of injunctive relief strongly indicate that the
remedy issue should be remanded to the district court. See *People of Village of
Gambell v. Clark*, 746 F.2d 572, 583 (9th Cir. 1984) (after finding that OCS lease
sale violated provision of Alaska National Interest Lands Act, Court finds that
parties' arguments regarding appropriate remedy "raise factual and legal issues that
have not been but should be considered initially by the district court"), *rev'd as to
merits determination sub nom. Amoco Prod. Co. v. Village of Gambell*, 480 U.S.
531 (1987).

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General

OF COUNSEL:

SUSAN CASON
  Attorney-Adviser
  Office of the Solicitor
  U.S. Department of the Interior
  1849 C Street NW
  Washington, D.C.  20240

SEPTEMBER 2012
90-1-18-12406

JOHN E. ARBAB
DAVID C. SHILTON
  Attorneys, United States Department
of Justice
  Environment & Natural Resources
Division
  P.O. Box 7415
  Washington, D.C.  20044
  (202) 514-5580

   s/ David C. Shilton

51

## STATEMENT OF RELATED CASES

The respondents are not aware of any related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE WITH
## FED. R. APP. P. 32(a)(7) AND 9TH CIR. R. 32-1

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and 9th Cir. R. 32-1, the foregoing Answer Brief of Defendants-Appellees is proportionately spaced, has a typeface of 14 points more, and contains 11,821 words.

 Sept. 5, 2012                                    /s  David C. Shilton
Date                                             David C. Shilton

53

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2012, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I further certify that all participants in this case are registered CM/ECF users will be served by the appellate CM/ECF system.

                       s/ David C. Shilton
                       David C. Shilton